**PFIZER INC.**

v.

**Margaret M. HECKLER, Secretary, Health & Human Services, et al., Appellants.**

**PFIZER INC.**

v.

**Margaret M. HECKLER, Secretary, Health & Human Services, et al., Appellants.**

**Nos. 83–1903, 83–1904.**

United States Court of Appeals, District of Columbia Circuit.

Argued 14 Feb. 1984.

Decided 1 June 1984.

---

Elise D. Smith, Atty., Health and Human Services, Washington, D.C., with whom J. Paul McGrath, Asst. Atty. Gen., and Mark W. Pennak, Atty., U.S. Dept. of Justice, and Juan A. Del Real, Gen. Counsel, Health and Human Services, Washington, D.C., were on the brief for appellants. Royce C. Lamberth, R. Craig Lawrence, and Rebecca

L. Ross, Asst. U.S. Attys., Washington, D.C., also entered appearances for appellants.

John E. Nolan, Jr., Washington, D.C., with whom Paul S. Miller, Fort Wayne, Ind., and Steven Reed, Washington, D.C., were on the brief for appellee.

Before WRIGHT, WILKEY and SCALIA, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

This case arises from a challenge by appellee Pfizer Inc. to the application of a regulation by the Department of Health and Human Services to a patented drug. The regulation establishes procedures whereby a maximum allowable cost ("MAC") may be set for a prescription drug for the purposes of limiting payment or reimbursement from federal funds under the Medicare and Medicaid programs. Pfizer contends that the regulation does not apply to patented drugs. The district court granted summary judgment for Pfizer and enjoined appellant Margaret M. Heckler, Secretary of Health and Human Services, from imposing a maximum allowable cost on government purchases and reimbursement for the patented drug Doxepin Hydrochloride pursuant to the regulation.[1] We reverse.

## I. The Regulatory Scheme

The Medicare and Medicaid statutes require that the federal government pay providers of medical services the reasonable cost of those services, excluding any part of the incurred cost which is unnecessary to the efficient delivery of health care services. In addition, payments made under federal grants to the states for medical assistance programs must be consistent with efficiency, economy, and quality of care.[2] The statutes provide that regulations shall be issued to establish the particular methods for determining the reasonable allowable cost of public expenditures for health services under those federal health care programs.[3]

In 1975 the Secretary of the Department of Health, Education and Welfare[4] issued regulations establishing procedures for determining the reasonable allowable cost of government purchases of and reimbursement for prescription drugs in federally subsidized health care programs under Medicare and Medicaid. Those regulations establish procedures for determining: (1) the maximum limits for federal reimbursement to medical providers and the states for prescribed drugs under the Medicare and Medicaid programs; (2) the allowable costs for drugs purchased with federal funds under projects for health care services; and (3) the allowable costs for drugs purchased directly by the Department.[5] Although the regulations do not fix the actual dollar figures for federal reimbursement or payment, they establish principles for ascertaining the allowable costs for prescription drugs. The regulations provide that the amount the Department will recognize for reimbursement or payment shall not exceed the *lowest* of: "(1) The maximum allowable cost (MAC) of the drug, if any, established in accordance with § 19.5 plus a reasonable dispensing fee; (2) The acquisition cost of the drug plus a reasonable dispensing fee; or (3) The provider's usual and customary charge to the public for the drug ...."[6] The second and third

---

1. Pfizer Inc. filed two complaints in the district court challenging the MAC limits set for Doxepin HCl for different sets of capsule dosages. Summary judgment was entered in both cases. *See* No. 79–0185, D.D.C. 29 June 1983 (mem.); No. 79–3399, D.D.C. 29 June 1983; Joint Appendix (J.A.) at 10, 16, 16a. These cases were consolidated on appeal.

2. 42 U.S.C. §§ 1395f(b), 1395x(v)(1)(A), 1396a(a)(30) (1976 & Supp. V 1981).

3. *Id.* § 1395x(v)(1)(A).

4. In 1979 HEW was redesignated the Department of Health and Human Services ("HHS"). *See* 20 U.S.C. § 3508 (1982). References to "the Department" are to HEW prior to the redesignation and to HHS after the redesignation.

5. Since their issuance in 1975 the regulations have been partially amended. The current regulations are described herein. *See* 45 C.F.R. § 19.1 (1983).

6. *See id.* § 19.3.

of these three cost limitations apply to all drugs for which the Department makes reimbursement or payment. The first cost limitation, however, applies only to those particular drugs for which the Department has established a "maximum allowable cost" (MAC) pursuant to specific procedures prescribed in the MAC regulation.[7]

The procedures in the MAC regulation for establishing a MAC limit for a particular drug begin with the identification of a drug as a candidate for the MAC program. The MAC regulation establishes the Pharmaceutical Reimbursement Board ("the Board") comprised of six employees of the Department, which identifies the specific drugs for which a MAC limit may be set. The regulation controls which types of drugs may be identified by the Board for MAC limits. It provides: "The Board shall identify those *multiple source drugs* for which significant amounts of Federal funds are or may be expended ... and for which there are or may be significantly different prices."[8] The regulation defines a "multiple source drug" as "a drug marketed or sold by two or more formulators or labelers or a drug marketed or sold by the same formulator or labeler under two or more proprietary names or both under a proprietary name and without such a name."[9] Thus the Board may identify a particular drug for the establishment of a MAC limit if the drug is marketed or sold by two or more formulators or labelers, provided only that significant amounts of federal funds are expended for the drug and that the drug is available at significantly different prices.

The MAC regulation requires the Board to notify the Food and Drug Administration ("the FDA") of each drug identified for a MAC limit. The purpose of the Board's notification is to obtain the FDA's judgment about the bioequivalency of the multiple source drug as well as its advice on other considerations relevant to the marketability of the drug. If the FDA does not advise delaying the establishment of a MAC, the Board proceeds to establish a proposed maximum allowable cost for the particular drug that has been identified.

The MAC regulation provides that price competition in the market shall be the basis upon which the MAC limit is set. The regulation states, "[T]he Board shall make an initial determination of the *lowest unit price* at which the drug is *widely and consistently available* from any formulator or labeler."[10] After the Board determines the lowest unit price, it decides whether that price should be proposed as the MAC for the particular multiple source drug. The Board then publishes a proposed MAC limit, with the reasons therefor, in the Federal Register for notice and comment, and holds a public hearing. If, at the conclusion of the notice and comment period and the public hearing, the Board determines that a MAC should be set for the particular drug, it proposes a final MAC. Approval by the Administrator of the Health Care Financing Administration within the Department is required before the proposed MAC determination becomes final. The final MAC together with a statement of the Board's reasons are published in the Federal Register.[11]

## II. THE DOXEPIN HCL PROCEEDINGS

The Pharmaceutical Reimbursement Board identified Doxepin HCl ("Doxepin") —an antidepressant drug—as a MAC candidate in 1977. Doxepin is marketed by two different suppliers in the United States: appellee Pfizer Inc., and Pennwalt Corporation, which is not a party in this litigation. Pfizer obtained a patent on Doxepin in 1969 and markets the drug under the trademark name "Sinequan." Pennwalt Corporation markets the drug

---

7. *See id.* § 19.5.

8. *See id.* §§ 19.5(a), 19.4(a) (emphasis added).

9. *See id.* § 19.2(d).

10. *See id.* § 19.5(c) (emphasis added). If the drug is not available at the same lowest unit price in some locations, the Board is directed to make a separate unit price determination for those locations. *See id.*

11. *See id.* § 19.5.

under the trademark name "Adapin," pursuant to a license issued to Pennwalt by a Pfizer subsidiary. The Board's identification of Doxepin for the establishment of a MAC was based on its determination that Doxepin was a multiple source drug, because both Pfizer and the Pennwalt Corporation market the chemically equivalent drug.

The Board determined that the lowest unit price at which Doxepin was widely and consistently available corresponded to the prices charged by the licensee, Pennwalt Corporation, as opposed to the patent holder, Pfizer, for specified capsule dosages of Doxepin. The Board published a notice in the Federal Register proposing MAC limits that were based on Pennwalt's lower prices for Doxepin capsules of 10, 25 and 50 milligrams.[12] Pfizer filed written comments with the Board and opposed the proposed MAC limits for Doxepin at the public hearing.[13] Pfizer objected to the MAC limits proposed for Doxepin on the ground, among others, that the MAC regulation does not apply to patented drugs and that, therefore, the Board could not establish a MAC for Doxepin.

After the public hearing, the Board published slightly modified, final MAC limits for 10, 25 and 50 milligram capsules of Doxepin in December 1978.[14] The Board responded to Pfizer's contention that the MAC regulation does not apply to patented drugs in a statement published with the MAC limit for Doxepin in the Federal Register:

> The MAC regulations provide that the Board is to identify those multiple-source drugs for which significant amounts of Federal funds are expended and for which there are significant different prices. The Board is then to determine the lowest unit price at which the drug is widely and consistently available. The MAC regulations make no mention of

patents. The Board, of course, could not MAC a patented drug where the patentholder had retained his legally protected monopoly and distributes only one form of the drug. In such a case, the drug product would not be a "multiple-source drug." Where, however, a patentholder has licensed another, and the licensee is producing and distributing the drug, the drug becomes "multiple-source" and thus becomes a candidate for MAC limits. In this instance, Pfizer has licensed Pennwalt, and it is the Pennwalt product upon which the MAC price is based.[15]

Subsequently the Board also set a final MAC limit for 100 mg. dosage capsules of Doxepin in 1979.[16]

These two MAC determinations were the subject of complaints filed by Pfizer in the District Court for the District of Columbia.[17] Pfizer sought a declaratory judgment that the MAC limits for government payments and reimbursement for Doxepin were unlawful, and it requested an injunction against the enforcement of the MAC limits for Doxepin. Pfizer challenged the application of the MAC regulation to Doxepin on several grounds. It contended that the Board did not abide by procedures in the MAC regulation when it allegedly failed to consider whether a higher cost limit was necessary for the efficient delivery of health care services. In addition, Pfizer charged that the Board violated the Administrative Procedure Act by failing to give adequate reasons for its action. Finally, among other things, Pfizer also claimed that MAC limits could not be established for Doxepin because the drug is patented.[18]

On 29 June 1983 the district court granted Pfizer's motion for summary judgment on the ground that the Board was precluded from establishing a MAC for Doxepin because the drug is subject to a patent. Because it granted judgment for Pfizer on

12. *See* 43 Fed.Reg. 36,698 (1978).

13. *See* J.A. at 11.

14. *See* 43 Fed.Reg. 57,972 (1978).

15. *See* 43 Fed.Reg. 57,974 (1978).

16. *See* 44 Fed.Reg. 50,651 (1979).

17. *See* J.A. at 28, 73.

18. *See* Complaint in No. 79–0185, J.A. at 39–56; Memorandum Opinion, D.D.C. 29 June 1983, J.A. at 2–3.

the issue of the MAC regulation's applicability to patented drugs, the district court found it unnecessary to decide the other issues presented by Pfizer's complaint. It enjoined the defendant Margaret M. Heckler, Secretary of Health and Human Services, from imposing MAC limits on Doxepin HCl prior to the expiration of Pfizer's patent in 1986.[19] This appeal ensued. We address only the issue presented to us by this appeal—namely, whether the MAC regulation applies to patented drugs.

## III. Interpreting the MAC Regulation

■ It is axiomatic that an administrative agency is bound by its own regulations.[20] If the MAC regulation is interpreted not to apply to patent drugs, then the Department's establishment of a MAC for Doxepin was improper. Pfizer contends that an Inflation Impact Statement (the "Statement") issued by the Department in conjunction with the proposed MAC regulation interprets the regulation as being inapplicable to patented drugs. This Statement, Pfizer argues, is a contemporaneous interpretation of the MAC regulation by the agency charged with enforcement of the regulation. Pfizer claims, therefore, that the Statement's interpretation of the MAC regulation is entitled to substantial deference by this court on review. The Appellant Secretary of Health and Human Services responds that the MAC regulation does not exclude patented drugs from the MAC program and that, furthermore, the Department's Inflation Impact Statement does not interpret the MAC regulations to exclude patented drugs.

### A. The Plain Meaning of the MAC Regulation

■ Our construction of the MAC regulation must begin with the words in the regulation and their plain meaning. On its face, the MAC regulation permits a MAC to be established for any "multiple source" drug, provided only that the drug is one for which significant amounts of federal funds are expended and which is available at significantly different prices.[21] The regulation defines "multiple source" purely in functional terms which are based on the availability of the drug from more than one source in the market. Any drug that is marketed or sold by "two or more formulators or labelers" is a multiple source drug according to the express definition in the regulation.[22] The relevant distinction in the regulation's scope is between multiple source and single source drugs; the regulation does not mention patented drugs nor suggest any distinction between patented and nonpatented drugs. Indeed, the language of the regulation is quite unambiguous on this point. Any *multiple source* drug for which significant federal funds are expended and for which there are significant price differences may be the subject of a MAC limit.[23] The language and the plain meaning of the regulation reveal no basis upon which an exemption from the MAC program can be inferred for multiple source drugs which are patented.

### B. The Purpose of the MAC Regulation

This construction of the MAC regulation based on its plain language is consistent with the avowed purpose of the MAC program. The objective of the MAC regulation is to permit the government to act as a prudent customer in expending federal funds for prescription drugs when there is price competition in the market for a particular drug. This underlying purpose of the MAC regulation does not support the exclusion of multiple source patented drugs from the MAC program.

19. *See supra* note 1, J.A. at 16, 16a.

20. *See, e.g., Morton v. Ruiz,* 415 U.S. 199, 235, 94 S.Ct. 1055, 1074, 39 L.Ed.2d 270 (1974); *Arizona Grocery Co. v. Atchison, Topeka & Santa Fe Railway Co.,* 284 U.S. 370, 389–90, 52 S.Ct. 183, 186, 76 L.Ed. 348 (1932).

21. *See* 45 C.F.R. § 19.5(a) (1983).

22. *See id.* § 19.2(d).

23. The MAC limit established for a particular drug does not apply, however, if the prescriber certifies that a particular brand of the drug is medically necessary for a patient. *See* 45 C.F.R. § 19.3(a)(3) (1983).

The Department's statutory mandate to ensure that government expenditures are economical in the health care field prompted the proposed MAC regulation, according to the Notice of Proposed Rule Making for the MAC regulation published in 1974. That Notice stated that "a number of drugs containing the same active ingredients in the same dosage form are available from different producers and labelers at significantly different prices."[24] Accordingly, the Department proposed to establish a procedure that would enable the government to act as a rational consumer by limiting payments and reimbursements for any multiple source drug to the lowest cost at which a chemically equivalent drug was widely and consistently available.[25] Because the purpose of the regulation was to permit the government to take advantage of price differences in the market, the Notice concluded that the MAC policy "would apply to *all* multiple-source drugs with significant price differentials."[26] Nowhere in the Notice was there any hint of an exclusion for multiple source drugs which are patented. The purpose of the MAC program as well as the Department's own interpretation of its proposed rule make it clear that the MAC rule did not contemplate any categorical exemption for patented drugs which are available from two or more sources.

The express purpose of the MAC program and the Department interpretation of the regulation were reiterated in the Notice of Final Rule Making for the MAC regulation. In published responses to comments submitted on the proposed MAC regulation, the Department stated:

> [A] number of drug containing the same active ingredients in the same dosage forms and strengths are available *from different formulators and labelers* at significantly different prices. In light of this fact and in the interest of the efficient administration of the duties with which the Secretary is charged, consist-

ent with quality care, the MAC regulation is issued *to take advantage of these varying multiple-source drug prices.*[27] In accordance with this purpose of allowing the government to take advantage of price competition in the market, the extensive published preamble to the final MAC regulation emphasized the distinction between drugs available from a single source, for which there would be no price competition, and those available from two or more sources at different prices. This distinction in the MAC regulation is intended to isolate factors which indicate the presence of price competition in the market for a particular drug. The preamble in the Notice of Final Rule Making does not mention patented drugs, because the status of a drug as patented or not is irrelevant to the effectuation of the MAC regulation's purpose of enabling the government to take advantage of price competition. The crucial distinction is whether a product is a single source or a multiple source drug.

Thus the MAC scheme as construed by its plain language and express purpose is simple. When a drug is available only from a single source, whether or not the drug is patented, reimbursement from public funds is limited to the lower of: (1) the acquisition cost plus a reasonable dispensing fee; and (2) the provider's usual charge to the public for the drug. When, however a drug is available from two or more sources, it may be a candidate for MAC limits regardless of its patented status, provided only that significant federal funds are expended for the drug and that it is available at significantly different prices.[28]

While the Secretary might (with sufficient evidentiary support) have chosen to make an exception for patented drugs, such an exception is certainly not mandated by the purpose of the MAC program. Indeed, such an exception, while arguably serving other desirable ends, would affirmatively frustrate that purpose with regard

**24.** 39 Fed.Reg. 40,302 (1974).

**25.** *Id.* at 40,302–03.

**26.** *Id.* at 40,303 (emphasis added).

**27.** 40 Fed.Reg. 32,288 (1975) (emphasis added).

**28.** 45 C.F.R. §§ 19.3, 19.5(a) (1983).

to the exempted drugs. The reason is clear, and demolishes the argument of the patent holder here. When a patent holder licenses its product for unrestricted distribution, the patent holder itself introduces competition into the market for its patented product. In return, the patent holder receives royalties pursuant to its licensing agreement with the licensee. If the licensee charges a lower price for the drug than the patent holder charges and that lower price is widely and consistently available, then informed, rational consumers will purchase the drug from the licensee at the lower price and the patent holder will receive compensation from the licensee in the form of royalties. Given that the purpose of the MAC regulation is to permit the government to act as any other prudent purchaser, there is no reason to infer an exemption in the MAC regulation for situations of price competition for a multiple source drug created by licensing of the drug by the patent holder.

## C. *The Inflation Impact Statement*

Despite the MAC regulation's clear language and its express purpose, Pfizer contends that the Inflation Impact Statement issued when the final MAC regulation was published exempts patented drugs from the MAC regulation. Pfizer relies on several references to patented drugs in the Statement, which Pfizer contends limit the scope of the MAC regulation to nonpatented multiple source drugs. Pfizer claims that the Statement is a contemporaneous interpretation of the regulation by the agency charged with its enforcement and that, therefore, the Statement's interpretation is entitled to substantial deference by this court on review.

The Inflation Impact Statement comprises the results of a study conducted by the Department on the costs and savings expected to flow from the MAC program. While the Statement is mentioned in the published preamble to the final MAC regulation,[29] it was neither published nor expressly incorporated into the regulation.

■ As a threshold matter, we decline to give the Statement controlling weight in interpreting the MAC regulation because the language of the regulation itself is clear and unambiguous. Under settled principles of statutory and rule construction, a court may defer to administrative interpretations of a statute or regulation *only* when the plain meaning of the rule itself is doubtful or ambiguous. The Supreme Court held in *Udall v. Tallman* that a court should be guided by an administrative construction of a regulation *only "if the meaning of the words used is in doubt."*[30] Deference to agency interpretations is not in order if the rule's meaning is clear on its face. Applying that principle in *Association of American Railroads v. Costle,* this court refused to defer to the preamble of a statute when the language in the operative, enacted statute was not ambiguous. We stated in that case, "Where the enacting or operative parts of a statute are unambiguous, the meaning of the statute cannot be controlled by language in the preamble."[31]

In the instant case, the operative parts of the MAC regulation are clear and unambiguous. MAC limits may be established for any *multiple source* drug for which federal funds are significantly expended and which is available at significantly different prices. Multiple source drugs are defined as those drugs that are available from two or more sources. There simply is no doubt or ambiguity in the operative definitions in the regulation as to whether multiple source drugs that are patented may be candidates for the MAC program. Language in the Inflation Impact Statement cannot control the plain meaning of the MAC regulation.

29. *See* 40 Fed.Reg. 32,287 (1975) ("The Secretary advises that the Department has prepared a statement which addresses the issues raised in these comments.").

30. 380 U.S. 1, 16 (1965) (emphasis added) (quoting *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)).

31. 562 F.2d 1310, 1316 (D.C.Cir.1977).

■ Second, even if it were appropriate for this court to defer to an agency's interpretation of a regulation that is clear on its face, the amount of deference to be accorded such an interpretation depends upon the purposefulness of the agency's interpretation, the depth and care of the agency's reasoning, and the interpretation's consistency with prior and subsequent interpretations by the agency. The Supreme Court stated in *Federal Election Commission v. Democratic Senatorial Campaign Committee* that the extent to which an agency's interpretation merits deference from a reviewing court depends upon "the thoroughness, validity, and consistency of an agency's reasoning."[32] And in *Skidmore v. Swift & Co.*, the Supreme Court stated: "The weight of such a judgment [by an agency] in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasonings, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." [33]

■ Under these standards of construction, the Inflation Impact Statement merits little deference on the issue now before the court. The Statement is not the product of adjudication nor is it rulemaking by the Department. The Statement was not formally published either as a response to comments submitted about the proposed MAC regulation or as a preamble to the final regulation. More importantly, the Statement does not purport to be a formal, reasoned interpretation of the scope of the MAC regulation. The inflation impact study was apparently conducted, at least in part, pursuant to an Executive Order which required the Department to evaluate the inflationary impact of proposed rules and regulations.[34] Nowhere does the Statement purport to interpret the MAC regula-

tion; its stated purpose is to assess the economic impact of the MAC program. Thus even if the Statement suggested that patented drugs were outside the scope of the MAC program, the persuasive force of that suggestion would be minimal, due to the Statement's lack of focus on and reasoned treatment of the issue now before the court.

Furthermore, such an interpretation of the MAC regulation by the Statement would not merit deference due to its inconsistency with other, published statements of the Department. *Skidmore v. Swift* counsels against deference to an agency's interpretation by a reviewing court if that interpretation is not consistent with other pronouncements of the agency. In the instant case, the Department on several occasions has clearly indicated that the MAC regulation applies to *all* multiple source drugs. For example, the Notice of Proposed Rule Making published together with the proposed MAC regulation in 1974 clearly and unequivocally stated that the proposed MAC regulation would apply to *"all* multiple-source drugs".[35] The numerous published remarks of the Secretary and of the Department suggest no categorical exemption from the MAC program for patented drugs.

More fatal to Pfizer's claim, however, even than the fact that the Statement warrants little or no deference by this court in construing the clear mandate of the MAC regulation, is the fact that the Statement does *not* interpret the MAC regulation to exclude patented drugs. Thus even if this court were required to give weight to language in the Inflation Impact Statement, the Statement does not posit an exemption from the regulation for multiple source drugs which are patented.

**32.** 454 U.S. 27, 37, 102 S.Ct. 38, 44, 70 L.Ed.2d 23 (1981).

**33.** 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944). *See Adamo Wrecking Co. v. United States,* 434 U.S. 275, 287 n. 5, 98 S.Ct. 566, 574 n. 5, 54 L.Ed.2d 538 (1978); *Batterton v. Francis,* 432 U.S. 416, 425–26 n. 9, 97 S.Ct. 2399, 2405–06, 53 L.Ed.2d 448 (1977).

**34.** *See* 40 Fed.Reg. 32,303 (1975); Executive Order 11,821, 3 C.F.R. 926 (1974). The Statement may also be part of the Department's general statement of the regulation's basis and purpose. *See American Medical Association v. Mathews,* 429 F.Supp. 1179, 1187–88 n. 6 (N.D.Ill.1977); 5 U.S.C. § 553(c) (1982).

**35.** *See supra* note 26 (emphasis added).

Several passages in the 41-page Statement touch upon patented drugs and the MAC program. In a section entitled "Pharmaceutical Research and Development," the Statement addresses the pharmaceutical industry's comments that the MAC regulation would reduce the industry's expenditures for research and development. The section states in relevant part:

> The decision to engage in research activities rests on the anticipated costs and benefits. The proposed regulations do not affect the cost of research and development. Since the patent system *affords protection from competition* to the originator of a new drug for 17 years from the date of the patent, the MAC program would not affect the price or sales of any patented product during this period. Only when patent protection ends will the product be subject to a MAC limit. While the profitability of the product may decline somewhat as a result of the application of the MAC regulations this occurs so far in the future (when viewed from the point at which the research decision is made) that the benefits from research are not significantly affected.[36]

Elsewhere the Statement discusses patented drugs in the context of projected savings from the establishment of MAC limits: "During FY 1976, patents will expire on several high volume products which would then be eligible for inclusion in the MAC program. These products will yield additional savings, but they are not included in the above estimates."[37] Pfizer contends that these two excerpts from the Inflational Impact Statement indicate that all patented drugs are exempt from the MAC program for the duration of the patents.

While the phrasing of these passages may be somewhat inartful, it is clear that the drafters of the two passages contemplated a situation in which the patent holder faced no competition from a licensee. The patented drugs were assumed to be single source drugs. Indeed this assumption is expressed by specific language in those passages indicating that the orginator of the patent was afforded "protection from competition." When a patent holder licenses a patented drug, it waives its right, subject to the terms of the license, to invoke the patent laws to prohibit the licensee from competing.[38] Given that the passages were not describing a situation in which a patent holder has created competition by licensing its product, the language is consistent with a reading of the MAC regulations that excludes single source drugs but includes *all* multiple source drugs. The Inflation Impact Statement posits that a patent holder who faces no competition from bioequivalent drugs in the market because it has exercised its lawful right to prevent distribution of the patented product by others will be outside the scope of the MAC program, because the patented product will not be a multiple source drug.

These two passages in the Statement do not address the situation of a patent holder who opens up the market for its patented product to competition, by for example, licensing the drug for sale by another manufacturer. When a rational patent holder chooses to license its patented product, its research and development costs presumably are recouped, at least in part, by the royalties paid to it by the licensee pursuant to a licensing agreement. Nothing in these two brief passages of the Statement discussing *the economic effects of the MAC* program on research and development expenditures and anticipated savings from the MAC program suggests that the MAC regulation was not intended to allow the government to act as any other prudent and informed consumer when the patent holder has created competition for its product and thereby rendered the product a multiple source drug.

---

36. *See* Inflation Impact Statement on C.F.R. Title 45, Subtitle A, Part 19—Limitations on Payment or Reimbursement for Drugs, J.A. at 123–24.

37. *See id.* at 136.

38. *United States v. Studiengesellschaft Kohle, m.b.H.,* 670 F.2d 1122 (D.C.Cir.1981).

Any doubt about the Statement's implicit assumption that the MAC regulation does apply to multiple source drugs which are patented is completely laid to rest by material elsewhere in the Statement. An appendix to the Statement contains at least two multiple source patented drugs, which are identified in the Statement's text as "likely ... candidates for MAC limits."[39] Indeed, one of the patented drugs which the Statement identifies as a possible candidate for the MAC program is Doxepin HCl—the very drug that is the subject of this litigation. The Inflation Impact Statement clearly does not evince an intention to exclude multiple source patented drugs from the scope of the MAC regulation.

Thus, even if this court were required to defer to the Inflation Impact Statement in construing the clear language of the MAC regulation, the Statement does not interpret the regulation to exclude patented drugs from the MAC program.[40] Pfizer's contention that the regulation does not apply to patented multiple source drugs is without merit.

## IV. APPLICATION OF THE MAC REGULATION TO DOXEPIN DOES NOT VIOLATE PATENT LAWS

In addition to charging that the MAC regulation does not apply to patented drugs, Pfizer suggests that the Department's application of the MAC regulation to the patented drug Doxepin is unlawful because it diminishes Pfizer's lawful patent protection. This contention is erroneous. U.S. patent laws grant a patentee "the right to exclude others from making, using or selling the invention throughout the United States" for a period of 17 years.[41] The essence of this property right was described by the Supreme Court in *Zenith Radio Corporation v. Hazeltine Research, Inc.:* "A patentee has the exclusive right to manufacture, use, and sell his invention .... The heart of his legal monopoly is the right to invoke the State's power to prevent others from utilizing his discovery without his consent."[42] This court similarly defined the scope of patent protection in *N.V. Philips' Gloeilampenfabrieken v. Atomic Energy Commission.*[43] There we held that the patent laws give a patent holder a legal monopoly, the essence of which is the right to exclude others from introducing the product into the market.

The patent laws provide, in addition, that a patent holder may relinquish or diminish its right to exclude competitors by granting licenses to others for the marketing of its patented product. Federal law allows a patent holder to assign or license a patent.[44] Furthermore, it is settled law that a licensing agreement may properly require that royalties be paid to the patent holder,[45] in order, among other things, to compensate the patent holder for research and development costs. Patent laws thereby enable a patent holder to control the supply of its product to the market within certain limits. The patent holder may decline to license the patent to competitors or it may condition licensing on factors such as the payment of royalties.[46]

The protections afforded patentees, however, do not include the right to prevent consumers from making rational purchases when the patent holder itself has

**39.** *See* J.A. at 127, 134, 157.

**40.** In addition, Appellee Pfizer in its brief quotes a single sentence from a brief apparently filed by the Department in another case before the District Court for the Northern District of Illinois, in an attempt to support its contention that the MAC regulation does not apply to patented drugs. Even if it were proper for this court to defer to a single sentence written by the Department's counsel in the context of litigation before another court, we do not read the sentence as construing the MAC regulation to exclude multiple source drugs that are patented. *See* Brief of Appellee Pfizer Inc. at 3.

**41.** 35 U.S.C. § 154 (1982).

**42.** 395 U.S. 100, 135, 89 S.Ct. 1562, 1582, 23 L.Ed.2d 129 (1969).

**43.** 316 F.2d 401, 409 (1963).

**44.** 35 U.S.C. § 261 (1982).

**45.** *See Zenith Radio Corp. v. Hazeltine,* 395 U.S. 100, 135–36, 89 S.Ct. 1562, 1582–83, 23 L.Ed.2d 129 (1969).

**46.** *See, e.g., United States v. General Electric,* 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362 (1926).

introduced competition into the market. Once the patent holder creates competition by licensing its product for distribution by another manufacturer, it relinquishes its monopoly position and faces competition in return for royalties from the licensee. While the patent holder may exercise control over the *supply* of the product to the market and the *number* of suppliers, its lawful power to exclude others does not include the power to prevent *consumers* from responding prudently to any competitive market conditions created by the patent holder.

█ In the instant case, the MAC regulation establishes a procedure whereby the federal government can act as a rational and prudent consumer when making expenditures for prescription drugs. As applied to Doxepin HCl, the MAC regulation enables the government to purchase Doxepin at a cost based on the lowest price widely and consistently available when the patent holder has created competition by licensing its product. The application of the MAC regulation to Doxepin does not unlawfully impair Pfizer's patent protection.

## V. CONCLUSION

The plain meaning of the MAC regulation and its express purpose make clear that the regulation applies to multiple source drugs which are patented. This interpretation of the regulation is not contradicted by the Inflation Impact Statement issued by the Department at the time the MAC regulation was initially proposed. Furthermore, application of the MAC regulation to the patented drug Doxepin HCl does not impair Pfizer's legal patent protection. Accordingly, the judgment of the district court is reversed. Because the district court granted summary judgment on only one of Pfizer's counts, we remand the case to the district court for its consideration of Pfizer's other claims.[47]

*So ordered.*

47. *See supra* TAN 18.