**SECRETARY OF LABOR, MINE SAFETY AND HEALTH ADMINISTRATION, Petitioner,**

v.

**WESTERN FUELS–UTAH, INC., and Federal Mine Safety and Health Review Commission, Respondents.**

No. 89–1258.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 26, 1990.

Decided April 6, 1990.

Jerald S. Feingold, Atty., Dept. of Labor, for petitioner. Dennis D. Clark, Atty., Dept. of Labor, Washington, D.C., also entered an appearance for petitioner.

Karl F. Anuta, Boulder, Colo., for respondent, Western Fuels–Utah, Inc.

L. Joseph Ferrara, Atty., Federal Mine Safety and Health Review Com'n, entered an appearance, for respondents, Federal Mine Safety and Health Review Com'n.

Before WALD, Chief Judge, and MIKVA and EDWARDS, Circuit Judges.

Opinion for the Court filed by Chief Judge WALD.

Dissenting opinion filed by Circuit Judge HARRY T. EDWARDS.

WALD, Chief Judge:

The Secretary of Labor, Mine Safety and Health Administration ("Secretary") petitions for review of a Federal Mine Safety and Health Review Commission ("FMSHRC" or "Commission") decision vacating an order and citation issued to Western Fuels–Utah, Inc. ("Western Fuels") for failure to task train one of its foremen in the operation of a roof bolting machine. We grant the petition and reverse the Commission's decision.

## I. BACKGROUND

### A. *Statute and Regulations*

Section 115(a) of the Federal Mine Safety and Health Act of 1977 ("Mine Act" or "Act"), 30 U.S.C. § 825(a), provides a comprehensive scheme for the training of miners. In general, § 115(a) requires training for new miners, annual refresher training and task training. With regard to task training, § 115(a) provides in relevant part:

(4) any miner who is reassigned to a new task in which he has had no previous work experience shall receive training in accordance with a training plan approved by the Secretary under this subsection in the safety and health aspects specific to that task prior to performing that task.

The Secretary of Labor's regulations implementing § 115(a) are set forth at 30 C.F.R. Part 48. With regard to task training for miners working in underground coal mines, 30 C.F.R. § 48.7(a) states in pertinent part:

Miners assigned to new work tasks as mobile equipment operators, drilling machine operators, haulage and conveyor systems operators, roof and ground control machine operators, and those in blasting operations shall not perform new work tasks in these categories until training prescribed in this paragraph and

paragraph (b) of this section has been completed.

Task training is required under § 48.7(a) of any miner who has not been trained on the task in question within the preceding 12 months.

The training requirements of § 48.7(a), are applicable to "miners" working in the underground mines. 30 C.F.R. § 48.1. 30 C.F.R. § 48.2(a)(1) provides in relevant part:

"Miner" means, for purposes of §§ 48.3 through 48.10 of this Subpart A [Training and Retraining of Underground Miners], any person working in an underground mine and who is engaged in the extraction and production process, or who is regularly exposed to mine hazards, or who is a maintenance or service worker contracted by the operator to work at the mine for frequent or extended periods. This definition shall include the operator if the operator works underground on a continuing, even if irregular basis.... This definition does not include:

(ii) Supervisory personnel subject to MSHA approved State certification requirements.

### B. *Facts*

While working as a section foreman at Western Fuels' Deserado Mine, an underground coal mine in Colorado, Carson Julius ordered one of two workmen operating a two-man roof bolting machine to go to lunch. Julius took over for the departing workman. While Julius and the other worker, Austin Mullens, were operating the roof bolting machine, an accident occurred and Austin Mullens was killed.

After investigating the accident, the Mine Safety and Health Administration ("MSHA") determined that Julius had not been task trained to operate the roof bolting machine during the 12 months preceding the accident. Consequently, the MSHA inspector issued an order pursuant to §§ 104(a) and 104(g)(1) of the Act alleging a violation of 30 C.F.R. § 48.7. Western

Fuels abated the order by task training Julius to operate a roof bolting machine.

## C. *Procedural History*

Western Fuels contested the order and citation before the FMSHRC. The Secretary filed a petition with the FMSHRC for a civil penalty for the violation set forth in the order and citation. The Administrative Law Judge ("ALJ") found for the Secretary, holding that the "supervisory personnel" exception to task training of 30 C.F.R. § 48.2(a)(1)(ii) does not apply to a person who may otherwise be assigned to supervisory activities when that person is engaged in the operation of mine equipment machinery, such as a roof bolting machine.

The Commission reversed the ALJ, stating that the ALJ's decision could not be squared with what it viewed as "the plain, unambiguous language of section 48.-2(a)(1)(ii).... The exclusion of 'supervisory personnel' from the definition of 'miner' in section 48.2(a)(ii) has a plain meaning apparent from any reasonable reading of the regulation. The term 'supervisory personnel' means individuals who are supervisors." Thus, the Commission held that such supervisors are exempted from the task training requirements regardless of whether they are acting in a supervisory capacity or are merely performing operations in lieu of ordinary miners.

## II. ANALYSIS

The Secretary argues that the Commission erred in holding that the meaning of the supervisory personnel exception of § 48.2(a)(ii) is plain. She contends that the scope of the regulatory exemption is not clear from the regulatory language and that since her interpretation is reasonable we must defer to it. We agree.

As the Tenth Circuit explained in *Emery Mining Co. v. Secretary of Labor, Mine Safety and Health Administration,* 744 F.2d 1411, 1414 (10th Cir.1984), "a regulation must be interpreted so as to harmonize with and further and not to conflict with the objective of the statute it implements. [Courts] must construe [regulations] in light of the statute[s they] implement[ ], keeping in mind that where there is an interpretation of an ambiguous regulation which is reasonable and consistent with the statute, that interpretation is to be preferred." (Citations omitted.) The Secretary's interpretation of § 48.2's "supervisory personnel" exception as applying only to supervisors when they are functioning as such and not when they are working as miners harmonizes with the Mine Act's objective as it pertains to the training of miners.

Section 115(a) of the Mine Act is intended to insure that miners will be effectively trained in matters affecting their health and safety, with the ultimate goal of reducing the frequency and severity of injuries in mines. 43 Fed.Reg. 47,454 (October 13, 1978). Indeed, Congress considered training to be of such great importance that it specifically empowered inspectors to withdraw untrained miners from the mines and to prohibit their reentry until they received proper training. 30 U.S.C. § 814(g).

Moreover, the affidavit of John C. English, former Director of MSHA's Office of Education and Policy Development, attests to the fact that supervisors untrained as miners but doing miners' work are responsible for a majority of mine fatalities. According to English, data analysis shows that the average fatality rate for supervisors exceeded that for miners in general by 0.13 to 0.09, respectively, per 200,000 employee hours worked from 1972 to 1977 and 0.10 to 0.06 from 1978 to 1980. Additionally, of the coal mine supervisory fatalities from 1973 through 1983, about 59% of them occurred while the victim was performing nonsupervisory tasks. Appendix ("App.") at 37. English concludes by noting that "[i]nstances where 'supervisors' spend a significant amount of time mining rather than supervising continue to come to MSHA's attention.... In the first half of 1986, supervisors were in the most hazardous mining occupation group, accounting for more than 25% of the total fatalities; once again of the supervisory fatals, the majority had been performing nonsupervisory tasks." App. at 41. These statistics make clear that the Secretary's interpreta-

tion of § 48.2's "supervisory personnel" exemption from task training harmonizes with the objective of § 115 of the Act; Western Fuels' interpretation does not.[1]

■ But even if Western Fuels' interpretation were equally consistent with the statutory objectives of § 115, we would still be compelled to defer to the Secretary. Indeed while Western Fuels' facial reading of § 48.2's "supervisory personnel" exemption is reasonable, so is the Secretary's, and we have explained that "when the Secretary and the Commission disagree on the interpretation of ambiguous provisions of the Mine Act, and both present plausible readings of the legislative text, this court owes deference to the Secretary's interpretation." *Secretary of Labor, Mine Safety and Health Administration, on behalf of Bushnell v. Cannelton*, 867 F.2d 1432, 1433 (D.C.Cir.1989). And we added that "[t]he Secretary is emphatically due this respect when she interprets her own regulations." *Id.* at 1435. Moreover, it is well-settled that an agency's interpretation of its own regulation is "of controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Bowles v. Seminole Rock Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945). *See also United States v. Larionoff*, 431 U.S. 864, 872–73, 97 S.Ct. 2150, 2155–56, 53 L.Ed.2d 48 (1977) (since agency's interpretation is not plainly inconsistent with the wording of the regulation it is due deference even though the regulation "contains a number of ambiguities"); *Udall v. Tallman*, 380 U.S. 1, 4, 85 S.Ct. 792, 795, 13 L.Ed.2d 616 (1965) ("The Secretary's interpretation may not be the only one permitted by the language of the orders, but it is quite clearly a reasonable interpretation; courts must therefore respect it."); *Hispanic Information & Telecommunications Network v. FCC*, 865 F.2d 1289, 1296 (D.C.Cir.1989) ("An agency's interpretation of its own regulations will be accepted unless it is

plainly wrong."); *FLRA v. U.S. Dept. of Treasury*, 884 F.2d 1446, 1454 (D.C.Cir. 1989). This doctrine is most compelling when the agency's "construction ... rests upon matters peculiarly within the administrator's field of expertise." *Southern Mutual Help Ass'n, Inc. v. Califano*, 574 F.2d 518, 526 (D.C.Cir.1977). *See also Jicarilla Apache Tribe v. FERC*, 578 F.2d 289, 292–93 (10th Cir.1978).

The Secretary's interpretation of § 48.2's exception from task training for "supervisory personnel" is by no means "plainly inconsistent" with the wording of § 48.2. While other regulations under the Act refer to supervisors,[2] § 48.2 refers to supervisory personnel. In common usage, "supervisory" is defined as "of or relating to supervision," which is defined as "the act of supervising." Webster's Third New International Dictionary at 2296 (1971). It follows that a person is "supervisory" so long as that person is in "the act of supervising." Once a person diverts from supervision to operate mine machinery or to do some other nonsupervisory mining task, that person is not engaged in the task of supervising and therefore is not "supervisory." The use of the adjective form "supervisory" rather than the noun "supervisor" emphasizes that it is the nature of the person's actions that is important and not the person's title or position.

The importance of the distinction in the Mine Act's regulatory scheme between one's job title and the actual task one is performing is further borne out by the language used in § 48.2's definition of "miner." Focusing on the activities to be performed and the hazards encountered rather than on the job title held, § 48.2 defines "miner" as any person "who is engaged in the extraction and production process, or who is regularly exposed to mine hazards." The term even includes the mine operator "if the mine operator

---

1. English noted that of all mining jobs, roof bolting is the most dangerous. Affidavit at 7. Moreover, English explained that the MSHA-approved state certificate training programs for supervisors are of a very general nature, covering functions associated with supervision and

not covering competency in actually operating mobile mine equipment or machinery.

2. Sections 48.5(1) and 48.6(3) (authority and responsibility of supervisors and miners in training programs).

works underground on a continuing, even if irregular, basis." In the same vein, § 48.7(a) is written to enumerate which activities, not which individuals, require task training:

> Miners assigned to new work tasks as mobile equipment operators, drilling machine operators, haulage and conveyor systems operators, *roof* and ground control machine operators, and those in blasting operations shall not perform new work tasks in these categories until training prescribed in this paragraph and paragraph (b) of this section has been completed.

(Emphasis added.)

■ Finally, the Secretary has consistently interpreted § 48.2's "supervisory personnel" exception as encompassing this function-title distinction, and consistency in an agency's interpretation of its own facially ambiguous regulations heavily favors judicial deference to that interpretation. *See Bowles*, 325 U.S. at 417–18, 65 S.Ct. at 1218–19 (Office of Price Regulation's interpretation of ambiguous regulatory provision supported by the "countless explanations and interpretations given to inquirers affected by this type of maximum price regulation"); *Larionoff*, 431 U.S. 872 n. 11, 97 S.Ct. at 2156 n. 11 (Navy's interpretation of regulation regarding payment of bonuses for re-enlistment supported by the fact that it had "apparently been the practice" of the Navy to apply the regulation according to the interpretation offered by the Navy); *Chemical Waste Management v. EPA*, 869 F.2d 1526, 1540 (D.C.Cir.1989) (EPA's interpretation of its own regulation "though not previously published in the Federal Register, has frequently been ap-

plied to individual cases during the past decade.").

Since the passage of § 48.2, the Secretary has published and disseminated widely three policy memoranda, each of which explains that the regulatory exemption applies only to supervisors when they are functioning in a supervisory capacity, not when they are carrying out the tasks of a miner.[3] The first memorandum was issued in question/answer format in 1980. In response to a question about the scope of the "supervisory personnel" exception, the memorandum clearly says that supervisors

> are only excluded from the training requirements under Part 48 when they are performing work normally performed by a supervisor.... [A] state certified supervisor performing the work of a miner would be required to be trained under Part 48. When such a state certified supervisor is performing this work, he would only be required to take Part 48 "Task training" in order to be considered trained as a miner under Part 48.

App. at 54. The second memorandum—MSHA Policy Memorandum No. 84–2 EPD is entitled "Training Requirements of 30 C.F.R. Part 48 for Mine Supervisors Who Perform Non–Supervisory Work." Issued in 1984, it similarly states that the "supervisory personnel" exception "applies only to the extent that supervisory work is being performed." App. at 55. This memorandum was distributed to *all* mine operators and bears the express admonition that it "should be brought to the attention of persons responsible for mine health and safety training." *Id.* Finally, in 1985, the Secretary published the "MSHA Administrative Manual 30 C.F.R. Part 48—Training and Retraining of Miners." In explaining

**3.** Beyond arguing from the Commission's invocation of the regulation's alleged plain meaning, Western Fuels' only support for its interpretation of the scope of § 48.2's "supervisory personnel" exemption is the reference in the Commission's decision to the preamble to the final rule. That preamble reads as follows:

> n. *Training of Supervisors.* The final rule retains the exclusion from these training requirements of supervisory personnel subject to any approved State certification program.... MSHA will approve or evaluate the

State certification programs to assure that such programs provide sufficient training *as an alternative to the training requirements of subparts A and B....*
(Emphasis added.) While the preamble could be read to indicate that state certifications are in lieu of § 48.7's task training requirements, it is equally plausible to read the same language as supporting the Secretary's construction; as used in the preamble "supervisory personnel" means persons with the title of supervisor who are engaged in supervisory activity.

the scope of the "supervisory personnel" exception, the manual specifically mentions as an example that "if a supervisor *operates mining equipment,* or performs extraction, production and maintenance work, that supervisor is a 'miner' when performing this work and must have been given task training under Section 48.7." App. at 60.[4] (Emphasis added.) Thus, the Secretary has consistently and publicly announced her interpretation of the regulation from its very inception.

### III. Conclusion

The Secretary's interpretation of § 48.2's exception of "supervisory personnel" from task training harmonizes with the objectives of the Mine Act and is consistent with both the wording of the regulation and prior interpretations of the Secretary. Deference to the Secretary's interpretation is therefore required as a matter of law. Consequently, we grant the petition for review, reverse the Commission's order and remand for proceedings consistent with this opinion.

*So ordered.*

HARRY T. EDWARDS, Circuit Judge, dissenting:

This case presents a fairly straightforward issue: whether a mining company can be cited under the Federal Mine Safety and Health Act ("Act") for failure to train a supervisor pursuant to a regulation that expressly exempts "supervisory personnel" from the training requirement. In my view, there is only one answer to the question posed.

The applicable regulations provide that "[m]iners ... shall not perform new work tasks in [certain work categories] until training ... has been completed," 30 C.F.R. § 48.7(a) (1988), but "[s]upervisory personnel subject to MSHA approved State certification requirements" are exempt from the training requirement, 30 C.F.R. § 48.2 (1988). Because the supervisor in question in this case was trained under a "MSHA approved State certification" program, the mining company ("Western Fuels") not surprisingly claims that the supervisor was exempt from the regulation. This contention appears irrefutable under the plain terms of the regulation, and the Federal Mine Safety and Health Review Commission ("Commission") so held in sustaining the position of the mining company.

The Secretary of Labor ("Secretary") now seeks to overturn the judgment of the Commission because, to put it starkly, the regulation should not be held to mean what it says. Although "supervisory personnel" are expressly exempt from the terms of the regulation, the Secretary claims that the regulation nonetheless covers supervisors who are engaged in the operation of mine equipment machinery, such as a roof bolting machine. In other words, the Secretary's position rests on the rather incredible claim that *the exemption is not meant to extend to those persons who are stated to be excluded whenever those persons are performing work of the sort covered by the regulation to which the exemption applies.* I recognize that reasonable people may disagree over the meaning of language, but this point is irrelevant in the face of the Secretary's bizarre construction of the regulation. I also recognize that we

---

**4.** Like the Commission, Judge Edwards believes that the plain meaning of § 48.2's "supervisory personnel" exception is clear and these policy memoranda contradict that clear interpretation to the detriment of Western Fuels. Judge Edwards therefore contends that since the Secretary has not published any of these memoranda in the *Federal Register,* § 552(1)(D) of the Administrative Procedure Act bars her from invoking them. Section 552(1)(D) provides that

    (1) Each agency shall separately state and concurrently publish in the Federal Register for the guidance of the public—

    . . . .

    (D) substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency. . . .

Because, however, we find the meaning of the critical words of § 48.2 ambiguous, and the function of the policy memoranda to be one of clarifying and not contradicting the regulation itself, we do not think that § 552 in any way bars consideration of the memoranda in this case. *See Bowles, Larinoff* and *Chemical Waste, supra.*

owe deference to an agency's interpretation of its own regulations, but this rule never has been thought to require a court to endorse a construction that finds no support whatsoever in the disputed provision and that appears to render the disputed language utterly superfluous.

I dissent because, in my view, the regulations at issue here cannot bear the meaning that the Secretary assigns to them. The procedural norms that underlie provisions in both the Constitution and the Administrative Procedure Act ("APA") direct courts presumptively to adhere to the plain meaning of regulations. Because in my view the plain meaning of regulations at issue here cannot bear the meaning the Secretary offers, this court should not defer to her interpretation. The implausibility of her reading—and of the readings expressed in the interpretive memoranda on which she also relies—effectively makes her reading an *amendment* to the regulations, and thus subject to the notice-and-comment procedures of 5 U.S.C. § 553 (1988).

Furthermore, even if the Secretary was free to modify the regulations through interpretive memoranda, those memoranda in which the Secretary set forth her interpretation of the exemption had to be *publish-*

*ed* in the Federal Register in order to be used to the detriment of Western Fuels. Failure to publish, pursuant either to 5 U.S.C. § 553 (1988) or 5 U.S.C. § 552(a)(1)(D) (1988), is thus fatal to the Secretary's case. Accordingly, I would uphold the decision of the Federal Mine Safety Health Review Commission.

## I. BACKGROUND

The Mine Safety and Health Administration ("MSHA") of the Department of Labor promulgated the regulations at issue in this case pursuant to the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § 825(a) (1982).[1] These regulations govern operation of certain kinds of mining equipment,[2] including the roof bolting machine that was in use when the miner was killed in the accident that gave rise to the administrative action under review. The regulations require that "miners" using this equipment receive a specified course of training; however, "supervisory personnel subject to MSHA approved State certification requirements" are excluded from the training regulation.[3] Indeed, the Preamble to the regulations makes it additionally clear that "[t]he final rule retains the exclusion from these training requirements of supervisory

---

**1.** In pertinent part, this statute requires that: Each operator of a coal or other mine shall have a health and safety training program which shall be approved by the Secretary. The Secretary shall promulgate regulations with respect to such safety and health training programs.... Each training program approved by the Secretary shall provide as a minimum that—

.... 

(4) any miner who is reassigned to a new task in which he has no previous work experience shall receive training in accordance with a training plan approved by the Secretary under this subsection in the safety and health aspects specific to that task prior to performing that task.

*Id.*

**2.** 30 C.F.R. § 48.7(a) (1988) provides:

(a) Miners assigned to new work tasks as mobile equipment operators, drilling machine operators, haulage and conveyor systems operators, roof and ground control machine operators, and those in blasting operations shall not perform new work tasks in these categories until training prescribed in this para-

graph and paragraph (b) of this section has been completed. This training shall not be required for miners who have been trained and who have demonstrated safe operating procedures for such new work tasks within 12 months preceding assignment. This training shall also not be required for miners who have demonstrated safe operating procedures for such new work tasks within 12 months preceding assignment.

**3.** 30 C.F.R. § 48.2 (1988) provides:

For the purposes of this Subpart A—

(a)(1) "Miner" means, for purposes of §§ 48.3 through 48.10 of this Subpart A, any person working in an underground mine and who is engaged in the extraction and production process, or who is regularly exposed to mine hazards, or who is a maintenance or service worker employed by the operator or who is a maintenance or service worker contracted by the operator to work at the mine for frequent or extended periods.... This definition does not include:

....

(ii) Supervisory personnel subject to MSHA approved State certification requirements....

personnel subject to an approved State certification program." [4]

After promulgating the regulations, including the exemption for supervisory personnel, MSHA wrote a series of documents ("interpretive memoranda") that offered an interpretation of the regulations and exemption. For example, the definition section of a set of training materials written in 1980 asserted that the "supervisory personnel" mentioned in 30 C.F.R. § 48.2 "are only excluded from the training requirements under Part 48 when they are performing work normally performed by a supervisor.... On the other hand, a state certified supervisor performing the work of a miner would be required to be trained under Part 48." MSHA, Part 48 Training Questions and Answers Policy Memorandum, *reprinted in* A. 54. Similarly, in a memorandum issued in 1984, the MSHA stated that the 48.2 exemption "applies only to the extent that supervisory work is being performed." MSHA Policy Memorandum No. 84–2 EPD, Nov. 27, 1984, *reprinted in* A. 55; *see also* MSHA Administrative Manual, 30 C.F.R. Part 48—Training and Retraining of Miners, July 1, 1985, at 2, *reprinted in* A. 60 (same). None of these interpretive memoranda was published in the Federal Register.

There is no dispute that, on the record in this case, the supervisor in question was fully qualified pursuant to a MSHA approved State certification training program, and thus was within the exempt class of "supervisory personnel" under 30 C.F.R. § 48.2. It is also undisputed that the supervisor had not been trained pursuant to the requirements of 30 C.F.R. § 48.7(a) at the time when the miner was killed in the accident that gave rise to the administrative action in this case.

**4.** The Preamble reads, in part, as follows:
The final rule retains the exclusion from these training requirements of supervisory personnel subject to an approved State certification program.... MSHA will approve or evaluate the State certification programs to assure that such programs provide sufficient training as an alternative to the training requirements of subparts A and B.... State certification pro-

## II. ANALYSIS

### A. Regulatory Plain Meaning and the Limits of Deference

"[I]t is elementary that an agency must adhere to its own rules and regulations. *Ad hoc* departures from those rules, even to achieve laudable aims, cannot be sanctioned, ... for therein lie the seeds of destruction of the orderliness and predictability which are the hallmarks of lawful administrative action." *Reuters Ltd. v. Federal Communications Comm'n*, 781 F.2d 946, 950–51 (D.C.Cir.1986); *see also Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 536 (D.C.Cir.1986) (Scalia, J.) ("It is axiomatic that an agency must adhere to its own regulations....").

Broad and nearly tautological statements like these do not by themselves, of course, give courts sufficient guidance to resolve cases. No one doubts or denies the veracity of the "elementary" and "axiomatic" proposition that an agency must follow its own regulations. The difficult question is not whether an agency should do so, but rather how a court ought to go about determining *when* an agency is or is not doing so.

As noted in part B. below, the norm counseling courts to rely presumptively on the "plain meaning" of regulations gives content to this "elementary" and "axiomatic" proposition. Thus,

Under settled principles of statutory and rule construction, a court may defer to administrative interpretations of a statute or regulation *only* when the plain meaning of the rule itself is doubtful or ambiguous. The Supreme Court held in *Udall v. Tallman* [380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965)] that a court should be guided by an administrative construction of a regulation only *"if the meaning of the words used is in doubt."*

grams are administered according to specific criteria, which helps insure that supervisors will receive adequate training. MHSA believes that a person is not necessarily adequately trained by virtue of holding a supervisory position and that it is essential for supervisors to receive formal training.
Supplementary Information to Final Rules, 43 Fed.Reg. 47458 (1978).

Deference to agency interpretations is not in order if the rule's meaning is clear on its face.

*Pfizer, Inc. v. Heckler,* 735 F.2d 1502, 1509 (D.C.Cir.1984) (citing *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965) (quoting *Bowles v. Seminole Rock Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945))) (emphasis original); *see also Accardi v. Shaughnessy,* 347 U.S. 260, 266–67, 74 S.Ct. 499, 502–03, 98 L.Ed. 681 (1954).[5]

In the administrative context, the plain-meaning norm underlies both the APA notice-and-comment protections and the Constitution's due process guarantees. Although courts must defer to an agency interpretation of its own regulations, "the due process clause prevents that deference from validating the application of a regulation that fails to give fair warning of the conduct it prohibits or requires". *Gates & Fox Co., Inc. v. Occupational Safety and Health Review Comm'n,* 790 F.2d 154, 156 (D.C.Cir.1986) (Scalia, J.) (citations omitted). And it is basic hornbook law in the administrative context that "the application of a regulation in a particular situation may be challenged on the ground that it does not give fair warning that the allegedly violative conduct was prohibited." *Phelps Dodge Corp. v. Federal Mine Safety and Health Review Comm'n,* 681 F.2d 1189, 1192 (9th Cir.1982).

### B. *The Secretary's Flawed Interpretation of the Regulations*

In my view, the reading the Secretary offers cannot be reconciled with the plain meaning of the regulations. The Secretary's attempted functional distinction between supervisory personnel engaged in supervisory activities and supervisory personnel not engaged in supervisory activities cannot be found in the regulation. Instead, the phrase "supervisory personnel" can plausibly be read to refer only to a *person,* and not, as the Secretary argues, to the activity of supervising. The exemption under 30 C.F.R. § 48.2 makes this clear by excluding those "supervisory personnel" who are "subject to MSHA approved State certification requirements." Supervisory *personnel,* not *activities,* are subject to this exemption.

The Preamble to the regulations makes this point even clearer. The Secretary explained the exclusion of "supervisory personnel" by stating that administration of state certification programs according to specific criteria "helps insure that *supervisors* will receive adequate training," and that "MHSA believes that a *person* is not necessarily adequately trained by virtue of holding a supervisory position and that it is essential for *supervisors* to receive formal training," such as, in this case, that received in the process of state certification. *See* Supplementary Information to Final Rules, 43 Fed.Reg. at 47458 (emphasis added). Each of the highlighted terms makes it unmistakably clear that the "supervisory personnel" referred to in the 48.2 exemption are persons, not activities.

Because the Secretary's interpretation cannot be gleaned from the language of the regulations, the construction offered is nothing more than an *amendment* to the current regulations.[6] And as the Commission cogently argued in the decision on review here, *see Secretary of Labor v. Western Fuels–Utah,* 11 F.M.S.H.R.C. 278, 286 (1989), *reprinted in* A. 22, 30, both the

---

**5.** *Cf. Daviess County Hosp. v. Bowen,* 811 F.2d 338, 345 (7th Cir.1987) (citations omitted):
[T]he Manual is best viewed as an administrative interpretation of regulations and corresponding statutes, and as such it is entitled to "considerable deference" as a general matter.... Nevertheless, such deference is not appropriate where the plain meaning of a statute or regulation rules out the interpretation expressed in a provision of the manual.

**6.** An amendment is, for purposes of the APA, a "substantive" or "legislative" rule, *i.e.,* one that

"has the force of law and narrowly limits administrative discretion"; such rules "must conform to the APA's rulemaking procedures." *Carter v. Cleland,* 643 F.2d 1, 8 (D.C.Cir.1980). In that respect, amendments or substantive rules are unlike "interpretive rules," *i.e.,* those that "merely clarif[y] or explain[ ] an existing rule or statute." *Id.; see also American Hosp. Ass'n v. Bowen,* 834 F.2d 1037, 1044–48 (D.C.Cir. 1987) (offering extended discussion of interpretive vs. substantive rule distinction within framework of APA § 553).

APA and the Mine Act require that amendments to these regulations be adopted only pursuant to notice-and-comment rulemaking. *See* 5 U.S.C. § 553 (1988); 30 U.S.C. § 811 (1982).[7]

There is an important connection between the norms underlying APA notice-and-comment procedures and those directing a court presumptively to adhere to the plain meaning of regulatory provisions. Parties subject to regulatory requirements, especially those that impose civil or criminal penalties, have *notice* of what is required of them only when they can reasonably discern the meaning of a regulation. Thus, courts presume that they should read language narrowly and literalistically not because literalism somehow captures the essence of language or because plain meaning is a juridical talisman, but rather because doing so is a way to make the procedural guarantees of notice and comment meaningful. Those guarantees would not be meaningful if an agency could effectively, constructively amend regulations by means of nonobvious readings without giving the affected parties an opportunity either to affect the content of the regulations at issue or at least to be aware of the scope of their demands. That is why when, as in this case, "a violation of a regulation subjects private parties to criminal or civil sanctions, a regulation cannot be construed to mean what an agency intended but did not adequately express." *Phelps Dodge Corp.*, 681 F.2d at 1193 (quoting *Diamond Roofing Co., Inc. v. Occupational Safety and Health Review Comm'n*, 528 F.2d 645, 649 (5th Cir.1976) (citations omitted)); *accord Gates & Fox Co, Inc.*, 790 F.2d at 156.

## C. *The Notice Requirements of Section 552*

Finally, even if the Secretary was somehow free to modify the regulations through the issuance of interpretive memoranda, *i.e.*, in lieu of notice and comment rulemaking, the Secretary still cannot prevail in this case. Under the Freedom of Information Act:

> (a)
>
> . . . .
>
> (1) Each agency shall separately state and concurrently publish in the Federal Register for the guidance of the public—
>
> . . . .
>
> (D) substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency. . . .
>
> . . . .
>
> Except to the extent that a person has actual and timely notice of the terms thereof; a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published.

5 U.S.C. § 552(a)(1)(D) (1988) ("§ 552"). As is obvious from the aforecited provision, the terms of section 552 require that any agency "statement[ ] of general policy" must be published in the Federal Register if it is to be used adversely against a party, *unless* the party has actual notice of the statement.

In the instant case, it is undisputed that the Secretary's interpretive memoranda reflected "statements of general policy or interpretations of general applicability formulated and adopted by the agency." *It is also absolutely undisputed, and the Secretary conceded as much at oral argument, that Western Fuels never had actual notice of these memoranda.*[8] There-

---

7. 30 U.S.C. § 811(a) provides in part that:
  The Secretary shall by rule in accordance with procedures set forth in this section and in accordance with section 553 of title 5 . . . develop, promulgate, and revise as may be appropriate, improved mandatory health or safety standards for the protection of life and prevention of injuries in coal or other mines.
  . . . .
    (2) The Secretary shall publish a proposed rule promulgating, modifying, or revoking a mandatory health or safety standard in the Federal Register.
  *Id.* § 811(a).

8. At oral argument, counsel for the Secretary recognized that he had no good answer to give regarding why section 552 should not apply, because counsel knew that the interpretive memoranda had not been published in the *Federal Register*, and that Western Fuels had no actual notice of the memoranda. In an effort to

fore, because the interpretive memoranda were never published in the Federal Register, Western Fuels could not "in any manner" "be adversely affected" by the terms of the memoranda. *See Cathedral Bluffs*, 796 F.2d at 539 (Scalia, J.) (§ 552 requires general statements of policy to be published in Federal Register); *accord Nguyen v. U.S.*, 824 F.2d 697 (9th Cir.1987). *But see Bailey v. Sullivan*, 885 F.2d 52, 62 (3d Cir.1989) (rule that merely clarifies or explains existing regulations will be deemed "interpretive," and thus exempt from notice requirements, under 5 U.S.C. § 553(b)(A)).

### III. CONCLUSION

A court is required to overturn agency action that is inconsistent with the agency's regulations. *See Shepherd v. Merit Systems Protection Bd.*, 652 F.2d 1040, 1043 (D.C.Cir.1981). Under the plain terms of the Secretary's regulations, because the supervisor in question was expressly exempt from the regulation's training requirement, there was absolutely no basis upon which to sanction Western Fuels. The Commission's decision on this point was correct and it should be upheld. The opinion of the majority attempts to "harmonize" the regulation with a certain perceived "objective of the statute." The problem with this approach is that it flies in the face of the clear terms of a regulation that is not in any way inconsistent with the statute; and, even worse, it results in a sanction against Western Fuels for an alleged breach of a regulation of which it had no notice. Because I cannot subscribe to this approach, I respectfully dissent.

circumvent the problem section 552 poses for the Secretary, at oral argument counsel for the Secretary belatedly disavowed reliance on the memoranda. Counsel rested the Secretary's entire case on the claim that her reading of the term "supervisory personnel" was reasonable with reference solely to the regulation, absent *any* reliance on the memoranda. In my view, this self-serving, *post hoc* "concession" from

counsel is irrelevant in our assessment of the merits of this case.

Furthermore, it is not reasonably possible to sustain the Secretary's position absent some reliance on the interpretive memoranda. It is *only* these memoranda, and not the regulation, that support the Secretary's bizarre interpretation.