NATIONAL FAMILY PLANNING AND
REPRODUCTIVE HEALTH ASSOCIA-
TION, INC., et al., Appellee,

v.

Louis W. SULLIVAN, M.D., Secretary,
U.S. Department of Health and
Human Services, Appellant.

No. 92–5252.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 14, 1992.

Decided Nov. 3, 1992.

Robert V. Zener, Atty., Dept. of Justice, with whom Michael Astrue, Gen. Counsel, Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., and Alfred Mollin, Washington, D.C., were on the brief for appellant.

James L. Feldesman, with whom Eugene R. Fidell, Washington, D.C., were on the brief, for appellee.

Before: MIKVA, Chief Judge, WALD and EDWARDS, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

The central issue presented in this case is whether the Department of Health and Human Services ("HHS"), in announcing that a 1988 regulation which had theretofore

been construed to strictly prohibit abortion counseling or referral of any kind in Title X programs, would thereafter be interpreted to permit doctors to counsel on abortion within the context of the doctor-patient relationship, erred in failing to first undertake the notice and comment rulemaking prescribed by the Administrative Procedure Act ("APA"), 5 U.S.C. § 553. The new "Directives" neither clarify nor explain the previous regulation, which was adopted by notice and comment rulemaking, but instead effectively amend the 1988 regulation to significantly alter its meaning, as previously interpreted and enforced by HHS and upheld by the Supreme Court in *Rust v. Sullivan*, —— U.S. ——, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). Accordingly, we conclude that the new Directives are not exempt from notice and comment rulemaking as an interpretative rule. We therefore affirm the judgment of the district court granting the National Family Planning and Reproductive Health Association, Inc. and the National Association of Nurse Practitioners in Reproductive Health (the "Associations") injunctive and declaratory relief enjoining the Secretary from proceeding with the enforcement of the new Directives without first adhering to the requirements of § 553 of the APA.

## I. BACKGROUND

Title X of the Public Health Service Act, 42 U.S.C. §§ 300—300a–6, provides at section 1008 that: "None of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning." 42 U.S.C. § 300a–6. In 1971, HHS issued regulations on this section, without notice and comment,[1] concluding that the statute simply required that a Title X "project will not provide abortions as a method of family planning." 36 Fed. Reg. 18,465, 18,466 (1971) (codified at 42 C.F.R. § 59.5(9) (1972)). During the mid–1970s, HHS General Counsel memoranda made a further distinction between directive ("encouraging or promoting" abortion) and nondirective ("neutral") counseling on abortion, prohibiting the former and permitting the latter. In 1980, through notice and comment rulemaking, HHS made a number of changes to the regulations governing Title X grants not relevant here and retained the 1971 language pertaining to the provision of abortion by Title X projects. 45. Fed.Reg. 37,433, 37,437 (1980) (codified at 42 C.F.R. § 59.5(5) (1980)). The following year, HHS issued "Program Guidelines," without notice or comment, "to assist current and prospective grantees in understanding and utilizing the Title X family planning services grants program." These guidelines mandated nondirective abortion counseling by Title X projects upon a patient's request.

In 1988, HHS promulgated by notice and comment rulemaking new regulations that established a much broader prohibition on abortion counseling or referrals including a "gag rule" applicable to all Title X project personnel against informing or discussing with clients the availability of abortion as an option for individual planning or treatment needs. 53 Fed.Reg. 2922 (1988) (codified at 42 C.F.R. pt. 59). The regulations provide that a "title X project may not provide counseling concerning the use of abortion as a method of family planning or provide referral for abortion as a method of family planning." 42 C.F.R. § 59.8(a)(1) (1991). A Title X project is permitted to refer pregnant clients "for appropriate prenatal and/or social services by furnishing a list of available providers that promote the welfare of mother and unborn child," *id.* at § 59.8(a)(2), but referrals may not be used

> as an indirect means of encouraging or promoting abortion as a method of family planning, such as by weighing the list of referrals in favor of health care providers which perform abortions, by including on the list of referral providers health care providers whose principal business is the provision of abortions, by excluding available providers who do not provide abortions, or by "steering"

---

1. Notice and comment rulemaking was waived under the good cause exception of 5 U.S.C. § 553(b)(3)(B). 36 Fed.Reg. 18,465.

clients to providers who offer abortion as a method of family planning.

*Id.* at § 59.8(a)(3).

The Supreme Court upheld both the constitutional and statutory validity of these regulations in *Rust v. Sullivan,* —— U.S. ——, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991), against a specific challenge that they directly interfered with a doctor's professional right and duty to treat his patient as he thought best.

On November 5, 1991, responding to widespread concerns that § 59.8 would interfere with the doctor-patient relationship, President Bush issued a memorandum to the Secretary of HHS, urging that the "confidentiality" of the doctor-patient relationship be preserved and that operation of the Title X program be "compatible with free speech and the highest standards of medical care." To accomplish this result, the President directed that the implementation of the regulations adhere to four principles:

> 1. Nothing in these regulations is to prevent a woman from receiving complete medical information about her condition from a physician.
>
> 2. Title X projects are to provide necessary referrals to appropriate health care facilities where medically indicated.
>
> 3. If a woman is found to be pregnant and to have a medical problem, she should be referred for complete medical care, even if the ultimate result may be the termination of her pregnancy.
>
> 4. Referrals may be made by Title X programs to full-service health care providers that perform abortions, but not to providers whose principal activity is providing abortion services.

In a press conference, the President asserted: "[U]nder my directive, they can go ahead—patients and doctors can talk about absolutely anything they want, and they should be able to do that."

The Secretary therefore directed the Assistant Secretary to comply with the principles announced by the President in implementing the regulations. On March 20, 1992, Deputy Assistant Secretary for Population Affairs William Archer issued a memorandum to HHS Regional Health Administrators ("RHAs"). The Archer memorandum restated the President's first principle and explained that "[t]his statement is intended to apply to medical information provided only by a physician directly to his or her patient, in a clinic visit or a subsequent telephone conversation directly with the physician." Collectively, the memoranda from the President, the Secretary and Deputy Assistant Secretary Archer (the "Directives"), distinguished physicians from other health care professionals for purposes of providing medical information, including abortion counseling.

The appellees in this case, organizations composed primarily of Title X grantees and family planning nurse practitioners, filed suit on April 16, 1992, challenging the validity of these Directives, asserting that the process by which they were adopted did not comply with the notice and comment provisions of the APA, and that the new policy embodied in the Directives was arbitrary and capricious. They sought to enjoin the Secretary from implementing § 59.8 as allegedly modified by the Directives. On May 28, 1992, the district court held for the Associations, concluding that the Directives constituted legislative, as opposed to interpretative rulemaking, and thus required notice and comment prior to promulgation. The court also held that the modification of § 59.8's gag rule to allow doctors to freely communicate and advise their Title X patients regarding abortion, while continuing the prohibition for other health care professionals, lacked a rational basis in the record. Accordingly, the court enjoined implementation of the guidelines and remanded the case to the agency for compliance with the APA, denying the Secretary's motion to stay the injunction pending appeal. This court, however, stayed the injunction pending disposition of this appeal.

## II. ANALYSIS

HHS is authorized to promulgate regulations governing the distribution of grants to Title X programs. 42 U.S.C. § 300a–4(a). An agency, in light of changing circumstances, is free to alter the in-

terpretative and policy views reflected in regulations construing an underlying statute, so long as any changed construction of the statute is consistent with express congressional intent or embodies a "permissible" reading of the statute, *see Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and is otherwise "reasonable," *see Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). In this appeal, we do not ultimately decide whether the agency's revised interpretation of Title X, as announced in the Directives, is either permissible under *Chevron* or reasonable under *State Farm. Cf. Planned Parenthood v. Casey*, — U.S. —, —, 112 S.Ct. 2791, 2824, 120 L.Ed.2d 674 (1992) (O'Connor, Kennedy and Souter, JJ.) (reasonable for state to require that physician, rather than a qualified assistant, provide patient with information on abortion-related matters); *id.* at —, 112 S.Ct. at 2867–68 (Rehnquist, C.J.) (same).[2] Instead, we confine our review to the more limited administrative law issue of whether HHS followed proper procedure in implementing the change.

■ The APA provides in relevant part: (b) General notice of proposed rule making shall be published in the Federal Register.... Except when notice or hearing is required by statute, this subsection does not apply—

(A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice....

5 U.S.C. § 553(b).[3] The Directives involved here seem clearly to constitute a "rule" under the APA, which defines that term as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy...." 5 U.S.C. § 551(4). The Secretary's memorandum began by stating that, "the President expressed to me his decision that, in implementing the Title X regulations, the Department of Health and Human Services should adhere to [the principles identified by the President]." Similarly, the Deputy Assistant Secretary's memorandum explains that it "is for use by Regional Office staff in implementing the February 2, 1988, regulation...." The only remaining question then is whether the statutory exception for interpretative rules is applicable so as to excuse notice and comment. *See Community Nutrition Inst. v. Young*, 818 F.2d 943, 945 n. 2 (D.C.Cir.1987). The dividing line between legislative and interpretative rules has been deemed "fuzzy" in some cases, *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 909 (5th Cir.1983); *see also Chemical Waste Management, Inc. v. EPA*, 869 F.2d 1526, 1534 (D.C.Cir.1989) (distinction "is admittedly far from crystal-clear"), but in the unique circumstances of this case, we find it relatively easy to make the call that the Directives are legislative rules. Briefly summarized, our reasoning is as follows: When an agency promulgates a legislative regulation by notice and comment directly affecting the conduct of both agency personnel and members of the public, whose meaning the agency announces as clear and definitive to the public and, on challenge, to the Supreme Court, it may not subsequently repudiate that announced meaning and substitute for it a totally different meaning without proceeding through the notice and comment rulemaking normally required for amendments of a rule. To sanction any other course would render the requirements of § 553 basically superfluous in legislative rulemaking by

---

**2.** Because we find that the Directives should have been promulgated through notice and comment rulemaking, we do not pass on the Associations' claim that the Directives are arbitrary and capricious.

**3.** If notice is required, comment must follow: (c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. 5 U.S.C. § 553(c).

permitting agencies to alter their requirements for affected public members at will through the ingenious device of "reinterpreting" their own rule.

A. *The 1988 Regulations Prohibited Physicians From Counseling on Abortion*

■ We begin with a review of the history surrounding the 1988 regulations. In promulgating the regulations, HHS explained that its previous rules on abortion counseling had created "confusion about precisely which activities were proscribed by [§ 1008], and had resulted in variations in practice by grantees." 53 Fed.Reg. 2922, 2924. HHS agreed with a 1982 General Accounting Office report recommending that the agency "establish clear operational guidance by incorporating into the title X program regulations and guidelines HHS' position on the scope of the restriction in section 1008." *Id.* (quoting GENERAL ACCOUNTING OFFICE, RESTRICTIONS ON ABORTION AND LOBBYING ACTIVITIES IN FAMILY PLANNING PROGRAMS NEED CLARIFICATION 22 (1982)). The agency therefore announced that its new rules for Title X grantees would be as definitive as possible:

> *Because the rules below address such a controversial issue, it is imperative that these final rules be precisely understood.* The extended discussion of the legal framework circumscribing the Department's regulatory authority and the detailed explanation of the Department's actions below are provided for this reason.

*Id.* at 2922 (emphasis added).

The "precise[ ] underst[anding]" of the rule on abortion counseling (§ 59.8) that HHS articulated was that any form of abortion counseling, whether directive or nondirective, by any Title X personnel, doctors, nurses, or others, would be strictly prohibited. HHS stated that the statutory "language clearly creates a wall of separation between Title X programs and abortion as a method of family planning." *Id.* Further, HHS believed that "counseling and referral for abortion are prohibited by section 1008," and more specifically that "[c]ounseling in a Title X program, wheth-

er directive or nondirective, which results in abortion as a method of family planning simply cannot be squared with the language of section 1008...." *Id.* at 2923. The absolute rule against abortion counseling or referral embodied in § 59.8 would, in HHS' words, "bring program practices into conformity with the language of the statute," and "establish far more specific and clearer standards for compliance with section 1008." *Id.* at 2923, 2925.

There was no hint in the agency's statement of basis and purpose accompanying the regulation, and certainly not in the regulation itself, to suggest that doctors would be exempt from the Title X abortion counseling ban. The rule was typically described in the broadest terms: "The rules ... do not prevent a health professional or a provider organization from discussing, promoting, or otherwise encouraging a woman to have an abortion as a general matter; they simply do not permit them to do so within a Title X project." *Id.* at 2936. There was only one brief discussion of the doctor-patient relationship in the explanation of the regulations. In response to concerns that § 59.8 would violate medical ethical obligations, HHS explained that while doctors may diagnose the health problems of pregnant patients, they may not discuss abortion:

> It was not the intent of the provision to restrict the ability of health professionals to communicate to a patient any information they discover in the course of physical examination or otherwise about her medical condition. Contrary to the assumption of most commenters, *doctors would not be precluded by the provision from informing a woman, pregnant or nonpregnant, that she has a tumor, AIDS, a diabetic or hypertensive condition, lupus, and so on.* The provision thus does not preclude a health professional from disclosing to the woman any physical findings he or she has made regarding her condition and communicating his or her assessment of the urgency of the need for treatment, consistent with the exercise of his or her professional judgment. By the same to-

ken, however, there would appear to be no ethical imperative for a health professional at a Title X clinic which will, by definition, not be providing treatment services to counsel a woman who displays a medical condition unrelated to family planning as to the medical management of that condition. Nor, it should be noted, is Title X money available for the treatment of medical conditions unrelated to family planning. The same considerations apply where pregnancy is diagnosed.

*Id.* at 2932 (emphasis added).

In arguing the validity of the regulations before the Supreme Court, HHS continued to stress that § 59.8 erected a complete prohibition on abortion counseling. Brief for Respondent, *Rust v. Sullivan*, —— U.S. ——, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). The regulation was described as broadly applying to "health care professionals," "Title X project personnel," "staff," and "employees." *Id.* at 24–27. Responding to concerns that the regulations improperly manipulated the doctor-patient dialogue, the Secretary answered that "the health care professional's dialogue is restricted in only one limited sense. He is hired to provide only pre-pregnancy family planning and infertility services and must refer the client to *other* qualified health care professionals for post-pregnancy services." *Id.* at 25 n. 25 (emphasis in original). The argument continued that the "regulations do not prevent a woman from obtaining abortion information; she simply must seek it from a source other than a Title X project," and that the rules "merely define the scope of the services that a federally subsidized Title X health care professional may provide in the context of a specific, limited program." *Id.* at 17.

Indeed, the Supreme Court, in upholding the regulations, underscored their application to all Title X personnel, including physicians. *Rust,* —— U.S. at ——, 111 S.Ct. at

1759. Chief Justice Rehnquist explained: "[The regulations] are designed to ensure that the limits of the federal program are observed. The Title X program is designed not for prenatal care, but to encourage family planning." *Id.* at ——, 111 S.Ct. at 1772. The opinion asserted that "a doctor employed by the project may be prohibited in the course of his project duties from counseling abortion or referring for abortion." *Id.* The Court specifically went on to rule that the regulation did not improperly impinge on the doctor-patient relationship:

Nor is the doctor-patient relationship established by the Title X program sufficiently all-encompassing so as to justify an expectation on the part of the patient of comprehensive medical advice. The program does not provide post-conception medical care, and therefore a doctor's silence with regard to abortion cannot reasonably be thought to mislead a client into thinking that the doctor does not consider abortion an appropriate option for her. The doctor is always free to make clear that advice regarding abortion is simply beyond the scope of the program.

*Id.* at ——, 111 S.Ct. at 1776. The Court explained that "[u]nder the Secretary's regulations ... a doctor's ability to provide, and a woman's right to receive, information concerning abortion and abortion-related services *outside* of the context of the Title X project remains unfettered." *Id.* at ——, 111 S.Ct. at 1777 (emphasis added). Nowhere in the Court's analysis was it ever suggested that the regulations might permit any implicit exception for doctors to counsel on abortion. Finally, not only did the Court accept HHS' argument that the regulations permissibly interpreted the statute, but it also accepted the agency's position that the regulations did not run afoul of the First and Fifth Amendments. *Id.* at —— – ——, 111 S.Ct. at 1771–78.[4]

---

**4.** Given the canon of statutory interpretation that a court should not defer to an agency's interpretation of a statute that raises serious constitutional concerns if "there is another interpretation, not raising these serious constitutional concerns, that may fairly be ascribed to

the statute," *Edward J. De Bartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 577, 108 S.Ct. 1392, 1398, 99 L.Ed.2d 645 (1988), the conclusion in *Rust* suggests that certainly the agency and perhaps the Court viewed the regulation as providing the

In sum, the history unequivocally shows that HHS expressly based the 1988 regulations on a particular interpretation of the language and purpose of the statute as outlawing any counseling or referral services dealing with abortions, even by doctors. The record further demonstrates that these regulations were so understood by HHS personnel and by Title X grantees and applicants. It is also undisputed that the 1988 regulations, including § 59.8, were intended by HHS to be legislative rules, governing the conduct of Title X grantors and grantees. *See* 53 Fed.Reg. 2922 ("It is expected that the amendments will improve compliance by grantees with the statute...."). The agency was exercising its congressionally delegated authority to issue binding regulations to implement the statute, and in so doing necessarily followed the required process of notice and comment rulemaking. *Id.; see also Batterton v. Francis*, 432 U.S. 416, 425 n. 9, 97 S.Ct. 2399, 2405 n. 9, 53 L.Ed.2d 448 (1977).[5]

The Supreme Court's decision in *Rust* upholding the regulation as interpreted by HHS served to cement its binding effect on lower courts and members of the public. Not only may this court not interpret the regulation differently from the Supreme Court but it must also judge subsequent HHS Directives in light of the Supreme Court's accepted interpretation of the clear meaning of the underlying regulation. *Cf. Lechmere, Inc. v. NLRB*, — U.S. —, —–—, 112 S.Ct. 841, 847–48, 117 L.Ed.2d 79 (1992) ("'Once we have determined a statute's clear meaning, we adhere to that determination under the doctrine of *stare decisis*, and we judge an agency's later interpretation of the statute against our prior determination of the statute's meaning.'") (quoting *Maislin Industries, U.S., Inc. v. Primary Steel, Inc.*, 497 U.S.

116, 131, 110 S.Ct. 2759, 2768, 111 L.Ed.2d 94 (1990)).

■ Similarly, an agency issuing a legislative rule is itself bound by the rule until that rule is amended or revoked. *See United States v. Nixon*, 418 U.S. 683, 695–96, 94 S.Ct. 3090, 3101–02, 41 L.Ed.2d 1039 (1974); *United States ex rel. Bilokumsky v. Tod*, 263 U.S. 149, 155, 44 S.Ct. 54, 56, 68 L.Ed. 221 (1923) (Brandeis, J.) ("It may be assumed that one under investigation with a view to deportation is legally entitled to insist upon the observance of rules promulgated by the Secretary pursuant to law."); 2 KENNETH C. DAVIS, ADMINISTRATIVE LAW TREATISE § 7.21 at 99 (2d ed. 1979) ("Since legislative rules when valid have the effect of a statute, the proposition that they bind the agency that issues them is hardly surprising."). HHS may not alter, without notice and comment, the 1988 regulations to permit doctors to give abortion counseling, unless such a change can be legitimately characterized as merely a permissible interpretation of the regulation, consistent with its language and original purpose. As we show in the next section, the Directives cannot meet such a test.

## B. *The Directives Are Legislative Rules*

■ HHS counsel conceded at oral argument that the agency interpreted its own 1988 regulation prior to the Directives not to permit physicians to counsel patients on abortion. In 1991, the Directives changed that basic understanding. Section 59.8(a)(1) of the 1988 regulations states that a "Title X project may not provide counseling concerning the use of abortion as a method of family planning or provide referral for abortion as a method of family planning." 42 C.F.R. § 59.8(a)(1). The Directives say that Title X physicians may, pursuant to the same regulations, provide counseling

---

most *accurate* interpretation of the statute. *See also* Thomas W. Mayo, *Abortion and Speech: A Comment*, 46 SMU L.REV. 309, 310–11 (1992). *But cf. Rust*, — U.S. at —, 111 S.Ct. at 1771 "[I]t was likely that any set of regulations promulgated by the Secretary—other than the ones in force prior to 1988 and found by him to be relatively toothless and ineffectual—would be challenged on constitutional grounds."

5. The fact that regulations may incorporate a particular interpretation of statutory language in no way changes their nature as legislative rules. *See, e.g., Chevron*, 467 U.S. at 837, 104 S.Ct. at 2779 (rule defining term "stationary source" is legislative).

and referrals for abortions when their medical judgment so dictates.[6] According to HHS briefs, "[b]ecause of the 1988 regulations, nurses may not counsel about abortion; under the 1988 regulations, as construed by the [Directives], physicians are not so limited," and more pointedly, physicians are now "free to speak without any constraints about abortion" within the context of the doctor-patient relationship. In testimony before the House Committee on Energy and Commerce, Subcommittee on Health and the Environment on March 30, 1992, Dr. Archer confirmed to Representative Waxman that doctors were now free to speak to patients about abortion:

> Mr. Waxman: If a patient is completely healthy and her pregnancy is normal, but she doesn't want to be pregnant, may a doctor counsel her about an abortion?
>
> . . . .
>
> Dr. Archer: If he believes that's in his best medical judgment, then he would continue with whatever discussion he thinks is appropriate.

It is a maxim of administrative law that: "If a second rule repudiates or is irreconcilable with [a prior legislative rule], the second rule must be an amendment of the first; and, of course, an amendment to a legislative rule must itself be legislative." Michael Asimow, *Nonlegislative Rulemaking and Regulatory Reform*, 1985 DUKE L.J. 381, 396. Judge Easterbrook has lucidly explained why in such circumstances notice and comment rulemaking must be followed:

> A *volte face* ... may be an attempt to avoid the notice and opportunity for comment that the Administrative Procedure Act requires for the alteration of a rule. When an agency gets out the Dictionary of Newspeak and pronounces that for purposes of its regulation war is peace, it

has made a substantive change for which the APA may require procedures. If in the air bags case, *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), instead of repealing the rule the agency had proclaimed that an ordinary seat belt is a "passive restraint", the Court would have treated this the same as it treated revocation of the rule. Both require notice, an opportunity for comment, and an adequate record.

*Homemakers North Shore, Inc. v. Bowen*, 832 F.2d 408, 412 (7th Cir.1987).[7] In this case, while we do not accuse the Directives of Orwellian overtones, they do represent a nonobvious and unanticipated reading of the 1988 regulation, which has the effect of cutting back significantly on its scope and proscriptions. In reviewing the validity of agency interpretations, "a court should be guided by an administrative construction of a regulation *only 'if the meaning of the words used is in doubt.'* Deference to agency interpretations is not in order if the rule's meaning is clear on its face." *Pfizer, Inc. v. Heckler*, 735 F.2d 1502, 1509 (D.C.Cir.1984) (citing *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965) (quoting *Bowles v. Seminole Rock Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945))) (emphasis in original). While an agency's construction of the statute need not always be correct for its rules to be considered interpretative, *see Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1308 (D.C.Cir.1991), the fact that its subsequent interpretation runs 180 degrees counter to the plain meaning of the regulation gives us at least some cause to believe that the agency may be seeking to constructively amend the regulation. *See Marshall v. Western Union Tel. Co.*, 621

---

**6.** In addition, Title X physicians are apparently exempted by the Directives from § 59.8(a)(3) which prohibits a Title X project from, among other things, "'steering' clients to providers who offer abortion as a method of family planning." Under the Directives, if a doctor is asked by a pregnant patient where she can get an abortion, the doctor would presumably be free to refer her to such a clinic. Under the President's memorandum, the doctor would only be forbidden from referring patients seeking abortions to "providers whose principal activity is providing abortion services."

**7.** In *Homemakers*, however, the court found that HHS had itself maintained a consistent position on the meaning of its rules, although the "Secretary's minions" had practiced conflicting interpretations. *Id.* at 413.

F.2d 1246, 1250 (3d Cir.1980) ("We believe that the district court erred in deferring to the Secretary's position because the workweek standard is in reality not an 'interpretation' of the governing statute but rather a substantive amendment of the regulations. As such, we believe the Secretary must engage in a rulemaking procedure conforming with the notice and comment provisions of [§ 553].").

In this case we have the additional, and somewhat unique circumstance of a direct clash between a Supreme Court reading of the 1988 regulation and the Directives. The Supreme Court's clear understanding of the 1988 regulation was that it prohibited abortion counseling by doctors. Now we are asked to forget that and docilely accept the Secretary's new interpretation of the same regulation which is dramatically opposed to the one he argued to the Court. In *United Technologies Corp. v. EPA*, we said that when an agency's rule runs in the opposite direction from a court's previous interpretation of its statutory requirements, that is strong evidence that the agency is making a legislative, not an interpretative, rule:

> The proper distinction between legislative and interpretative rules is shown even more clearly in *Chamber of Commerce v. OSHA*, 636 F.2d 464 (D.C.Cir. 1980). There, after a judicial determination that neither the Occupational Safety and Health Act of 1970 (the "OSHA Act"), nor section 3(*o*) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 203(*o*) (1982), *required* that employees be compensated for time spent accompanying OSHA inspectors during work site examinations, *see Leone v. Mobil Oil Corp.*, 523 F.2d 1153 (D.C.Cir.1975), the Department of Labor promulgated a rule requiring employers to so compensate their employees. The court reasoned that such a rule could not be interpretative because its decision in *Leone* foreclosed the possibility that any statutory provision of either the FLSA or the OSHA Act imposed a duty for employers to pay employees for time spent accompanying inspectors during on-site inspections. Because "Congress ha[d] not 'leg-

islated and indicated its will' on the question ... [,] the Administration must have done more than exercise its ' "power to fill up the details." ' " 636 F.2d at 469 (quoting *United States v. Grimaud*, 220 U.S. 506, 517, 31 S.Ct. 480, 483, 55 L.Ed. 563 (1911) (quoting *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 43 [6 L.Ed. 253] (1825))). Rather "the Administration has attempted through th[e] regulation to *supplement* the [OSHA] Act, not simply to construe it, and therefore the regulation must be treated as a legislative rule." *Id.* (emphasis added).

821 F.2d 714, 719 (D.C.Cir.1987). Just so here. The fact that the Supreme Court has read the 1988 regulation to prohibit abortion counseling by doctors, is persuasive evidence that HHS' current view that the regulation permits physicians to so counsel is a legislative rule. Obviously, HHS may for good cause, change the regulation and even its interpretation of the statute through notice and comment rulemaking, but it may not constructively rewrite the regulation, which was expressly based upon a specific interpretation of the statute, through internal memoranda or guidance directives that incorporate a totally different interpretation and effect a totally different result.

█ Caselaw here and in other circuits confirms the conclusion that the Directives are not interpretative rules. A rule that clarifies a statutory term is the classic example of an interpretative rule. *See Alcaraz v. Block*, 746 F.2d 593, 613 (9th Cir.1984) (interpretative rules " 'are those which merely clarify or explain existing law or regulations,' " and "are essentially hortatory and instructional") (citations omitted); *Batterton v. Marshall*, 648 F.2d 694, 705 (D.C.Cir.1980) (interpretative rule "serves an advisory function explaining the meaning given by the agency to a particular word or phrase in a statute or rule it administers").

An agency rule that reminds parties of existing statutory duties is also considered interpretative, not legislative. *See Cabais v. Egger*, 690 F.2d 234, 238 (D.C.Cir.1982) (Secretary's recommendation to state agen-

cies that they pass legislation conforming their unemployment income plans to a federal scheme, as they were required to do under a federal statute, was interpretative); *Citizens to Save Spencer County v. EPA*, 600 F.2d 844, 876 n. 153 (D.C.Cir. 1979). Similarly, a regulation that "merely tracked" the statutory requirements and thus "simply explained something the statute already required," has usually been deemed interpretative. *Alcaraz*, 746 F.2d at 613. Sometimes courts also give weight on the interpretative side to the fact that an agency's rule is explicitly based upon an analysis of the meaning of the statute or regulation. *See General Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1565 (1984) (*en banc*) (rule is interpretative in part because "EPA's entire justification for the rule is comprised of reasoned statutory interpretation, with reference to the language, purpose and legislative history of section 207(c)", *cert. denied*, 471 U.S. 1074, 105 S.Ct. 2153, 85 L.Ed.2d 509 (1985); *United Technologies*, 821 F.2d at 718–19. *But cf. Fertilizer Inst.*, 935 F.2d at 1308 ("[T]he fact that the EPA's interpretation of CERCLA's reporting requirement does not include a full-blown inquiry into Congress's intent does not prevent the preamble passage from being an interpretative rule.").

◼ Conversely, a legislative or substantive rule is one that does more than simply clarify or explain a regulatory term, or confirm a regulatory requirement, or maintain a consistent agency policy. For instance, in *American Hospital Association*, this court shared the view of the district court that requirements in an HHS manual defining procedures governing review functions of Peer Review Organizations were "not interpretations of any explicit statutory provisions," and did "not merely interpret or elucidate HHS' official position." *American Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1049–50 (D.C.Cir.1987) (quoting *American Hosp. Ass'n v. Bowen*, 640 F.Supp. 453, 462–63 (D.D.C.1986)); [8] *see also Pickus v. United States Bd. of Pa-*

*role*, 507 F.2d 1107, 1113 (D.C.Cir.1974) (guidelines for determining parole eligibility were "not interpretations of a statute's meaning. Rather they are self imposed controls over the manner and circumstances in which the agency will exercise its plenary power."). Thus, a rule is legislative if it attempts "to supplement [a statute], not simply to construe it." *Chamber of Commerce v. OSHA*, 636 F.2d 464, 469 (D.C.Cir.1980); *see also Citizens to Save Spencer County*, 600 F.2d at 879 (rules were legislative because agency sought to fill in gaps and resolve inconsistencies left by statute and "by no stretch of the imagination could [the rules] have been derived by mere 'interpretation' of the instructions of Congress"). Other times, courts have explained that a rule which "effect[s] a change in existing law or policy" is legislative. *Powderly v. Schweiker*, 704 F.2d 1092, 1098 (9th Cir.1983).

HHS did not specifically identify, until this appeal, the terms in the 1988 regulation which the Directives are purportedly interpreting, namely "counseling" and "abortion." *See* Appellant's Reply Brief at 3–5; Appellee's Brief at 27. It now points out that the Secretary noted in his memorandum that he found the President's memorandum to be "fully consistent with all relevant authorities," and that the Assistant Secretary should "interpret and enforce the Title X regulations in accordance with the four principles that the President has articulated." But while the stated intent of the agency in promulgating the rule merits consideration, *see Chamber of Commerce*, 636 F.2d at 468, "the agency's own label, while relevant, is not dispositive," *General Motors*, 742 F.2d at 1565. Furthermore, as this court explained in *Citizens to Save Spencer County*:

> The *post hoc* characterizations of these rules as interpretive by EPA counsel are of no avail. As the Second Circuit has noted, "[T]he label that the particular agency puts upon its given exercise of administrative power is not, for our pur-

---

8. However, while the manual was not exempt from notice and comment as an interpretative rule, we found that it was exempt as a procedur-

al rule under § 553. *American Hosp. Ass'n*, 834 F.2d at 1050.

poses conclusive; rather it is what the agency does in fact."

600 F.2d at 879 n. 171 (quoting *Lewis–Mota v. Secretary of Labor,* 469 F.2d 478, 481–82 (2d Cir.1972)). Even the Secretary's counsel admitted before the trial court that "[i]t would make it too easy if the Secretary could merely come in and say it's an interpretive rule."

More importantly, the record does not support HHS' argument that the Directives do nothing more than make explicit something that was already implicit in the 1988 regulation. First, as previously mentioned, it is clear that there was never any confusion among HHS policymakers or the public over whether doctors were covered by the gag rule in § 59.8.

Second, the Directives themselves suggest that the amendment was motivated not by an interpretation of the regulation's terms, but instead by a previously unacknowledged concern for the special relationship between doctors and their patients. The President expressly premised his modification of the counseling ban as necessary to "ensure that the confidentiality of the doctor/patient relationship will be preserved," and the Secretary explained that he was "committed to preserving the confidentiality of the doctor/patient relationship." Nowhere in the Directives were interpretations of the regulatory terms "abortion" and "counseling" mentioned as the target of the new policy. Before the district court, HHS counsel perhaps made the point best that the Directives are based on something other than an interpretation of the terms of the 1988 regulation:

I do want to make it clear that the Secretary's regulations promulgated in 1988 prohibited all health-care providers from providing abortion counseling and referral.... That is how they originally ... interpreted, and that is what the Supreme Court affirmed in its 1991 decision. Now, since that time, the Secretary has reviewed this program and has come to the decision that, in order to

ensure that abortion counseling and referral is not provided by these Title X programs, it is not necessary to police the confidential conversations between a physician and his or her patients.... What it does, what these guidelines are intended to do, and their purpose and their effect is accommodate the two interests: prohibit these programs from providing abortion counseling and referral, and at the same time also accommodate the interests of a physician to speak frankly to his or her patient, to provide whatever medical advice that that physician deems to be appropriate.

▋ Third, rather than simply interpreting the regulation, HHS clearly intends to "grant rights, impose obligations, or produce other significant effects on private interests," *Batterton,* 648 F.2d at 701–02; *see also General Motors,* 742 F.2d at 1565. As part of the modification of the gag rule, the Directives require that Title X grantees sign an assurance within 30 days of notification by an RHA that the grantee will adhere to § 59.8 as altered by the Directives. RHAs are permitted to request documentation from the projects to verify their compliance, including "[c]opies of protocols to be used by the Title X project in counseling and referring pregnant clients," "[t]he plan of the applicant or grantee for training Title X project staff about the regulatory requirements," and "[t]he plan of the applicant or grantee for monitoring compliance with the regulation at the clinic or other service delivery level, including the type and frequency of monitoring activities to be undertaken." Further, RHAs are directed to "conduct site visits, program reviews, or investigations of specific inquiries initiated in response to complaints." If a Title X program is found not to be in compliance with the Directives, "standard grants management procedures will be followed by the Department in seeking a remedy," which presumably means that the program could lose its grant.[9]

---

**9.** HHS does not question the standing of the Associations to bring this action but the issue should nevertheless be addressed. The National Family Planning and Reproductive Health Asso-

ciation, a group made up primarily of Title X grantees, has standing to challenge the Directives because of the potential loss of grants that organization's members may suffer if they

Moreover, doctors who were previously able to refuse to provide advice on abortion, *see Rust,* —— U.S. at ——, 111 S.Ct. at 1776 ("The doctor is always free to make clear that advice regarding abortion is simply beyond the scope of the program."), now are expected to answer questions concerning abortion. Clearly, the agency intends the Directives to have present binding effect on Title X programs. HHS counsel explained to the district court that the Secretary's "officials have no latitude at all in this regard. They have to comply with these guidelines." As this court recently pointed out in *McLouth Steel Products Corp. v. Thomas,* a rule that "substantially curtails EPA's discretion in delisting decisions and accordingly has present binding effect," is a legislative rule. 838 F.2d 1317, 1322 (D.C.Cir.1988) (citing *Community Nutrition Inst.,* 818 F.2d at 943); *see also National Latino Media Coalition v. FCC,* 816 F.2d 785, 788–89 (D.C.Cir.1987) (FCC's rule on tie-breaking procedures in licensing proceedings was merely speculative, serving notice that the agency might in some future proceeding resolve a tie by applying the rule, and therefore was interpretative).

Other recent decisions of this court are consistent with our conclusion that the Directives are legislative rules. In *General Motors,* the court found an EPA regulation to be interpretative in part because the agency labeled its notice in the Federal Register as *"Action:* Interpretive Rule," and because the agency expressly supported its view with a reasoned statutory interpretation. 742 F.2d at 1565; *see also United Technologies,* 821 F.2d at 718–19. But "most importantly, the rule did not

create any new rights or duties; instead, it simply restated the consistent practice of the agency...." *General Motors,* 742 F.2d at 1565. None of these factors is present in this case: the Directives themselves are not self-identified as interpretative; HHS did not support its view with reference to the regulation's terms or history, much less publish an explanation; and the Directives represent a new approach which permits doctors for the first time to offer directive abortion counseling. In *Fertilizer Institute,* the EPA "set[ ] out in detail its interpretation" of the CERCLA term "release" in a preamble to a rule the agency promulgated pertaining to the release of radionuclides. 935 F.2d at 1306. The rule, but not the preamble, was subject to notice and comment, *id.* at 1306–07, but the court rejected a claim that the definition was legislative and needed to be promulgated through notice and comment, concluding that the EPA was entitled to define a statutory term without notice and comment, *id.* at 1308. In the present case, however, the Directives do not on their face purport to interpret the term "counseling," but instead explain their derivation from a concern independent of the regulatory text. Moreover, this case concerns not an agency's first attempt at interpreting a statutory term but a situation where the agency has, through legislative rulemaking, already interpreted the statute, and is now changing that interpretation. Finally, neither *Fertilizer Institute* nor *General Motors* involved a prior Supreme Court decision construing the very provision upon which a subsequent reinterpretation was based. According to *United Technologies,* 821 F.2d at 719, and *Chamber of Com-*

---

violate the Directives. *See Rust,* —— U.S. at ——– ——, 111 S.Ct. at 1766–67 (Title X grantees had standing to challenge facial validity of 1988 regulations); *Southern Mut. Help Ass'n v. Califano,* 574 F.2d 518, 524 (D.C.Cir.1977) (health care provider whose future ability to obtain grants was threatened by agency action had standing). The standing of one of the plaintiffs is sufficient to allow the court to hear this case. *See Watt v. Energy Action Educ. Found.,* 454 U.S. 151, 160, 102 S.Ct. 205, 212, 70 L.Ed.2d 309 (1981); *Humane Soc'y v. Hodel,* 840 F.2d 45, 60 n. 27 (D.C.Cir.1988). However, we note that the district court also found that the members

of the National Association of Nurse Practitioners in Reproductive Health were permitted before the Directives, to diagnose and refer under a physician's protocols pregnant patients to abortion providers in cases of emergency, but that after the Directives, the nurses are no longer permitted to do so. HHS counsel assured us at oral argument that the responsibilities of nurses have not changed under the Directives; although we do not settle the point, we believe that the Title X grantees' standing is sufficient to confer jurisdiction over the portion of the appeal we decide.

*merce,* 636 F.2d at 469, an agency's attempt to go beyond what a court previously determines to be a regulation's clear meaning suggests an attempt to supplement or amend the regulation, and therefore supports a legislative nomenclature.

In sum, the Directives do not simply explain or clarify the 1988 regulation or confirm requirements under that regulation. Instead, based on new concerns about the doctor-patient relationship, HHS is substantially amending and even repudiating part of its original regulation. We also find it revealing that this modification does not come at a point in time when the agency is first applying a possibly ambiguous and broad regulation but rather after the agency and the Supreme Court have very recently reaffirmed a clear and definitive meaning of the regulation as a prohibition on abortion counseling by all Title X personnel. Cumulatively, all of these factors impel us to the conclusion that the agency's current rule permitting physicians to counsel on abortion is legislative, and must proceed through notice and comment if the procedural mandate of § 553 of the APA is to be honored.

### C. *Notice and Comment*

"If the courts accept the agency's interpretation, it becomes a part of the statutory law without any formally legislative action on the part of the agency." Robert A. Anthony, *"Well, You Want the Permit Don't You?" Agency Efforts to Make Nonlegislative Documents Bind the Public,* 44 ADMIN.L.REV. 31, 38 (1992). Courts must therefore be wary not to accord this elevated status too easily to agency missives unless it is clear that the rule is merely interpretative and therefore already implicitly part of the statute or regulation. If a court mistakenly gives an agency interpretation the force of law, "an especially odious frustration is visited upon the affected private parties: they are bound by a proposition they had no opportunity to help shape and will have no meaningful opportunity to challenge when it is applied to them." Robert A. Anthony, *Which Agency Interpretations Should Bind Citizens and the Courts?,* 7 YALE J. ON REG. 1, 58

(1990). Care is particularly appropriate here where the agency seeks to establish what is essentially a new rule of conduct for Title X grantees without providing the affected parties any formal notice. The new rule consists in this case of three internal, unpublished documents; memoranda from the President to the Secretary, from the Secretary to the Assistant Secretary, and from the Deputy Assistant Secretary to the RHAs. Each RHA is required only to notify Title X grantees of the new rules, not to provide any explanation for the change and not to notify the general public.

This court has recognized the laudable goals of § 553's notice and comment requirement to increase public participation and fairness in agency decisionmaking and to establish a mechanism by which an agency can improve its own information base, and therefore has "consistently declined to allow the exceptions itemized in § 553 to swallow the APA's well-intentioned directive." *American Hosp. Ass'n,* 834 F.2d at 1044 (citing cases). The notice and comment "guarantees would not be meaningful if an agency could effectively, constructively amend regulations by means of nonobvious readings without giving the affected parties an opportunity either to affect the content of the regulations at issue or at least be aware of the scope of their demands." *Secretary of Labor v. Western Fuels–Utah, Inc.,* 900 F.2d 318, 327 (D.C.Cir.1990) (Edwards, J., dissenting).

The district court found that HHS' new rules "change the 1988 directives in very important ways." According to Judith DeSarno, Executive Director of the National Family Planning and Reproductive Health Association:

Title X services, including counseling and referral services for pregnant patients, are typically carried out by professional health care providers other than physicians under protocols and/or standing orders adopted and issued by the medical director of the Title X project, who is a physician.

Even if the Directives do not "relegate nurse practitioners to the status of second-

class citizens in the health care profession," as the district court found, the distinction they establish between abortion counseling by doctors and other health professionals is, as the Associations assert, one "of enormous consequence for the health care industry." Nurses and other health care professionals had no reason to anticipate in 1988 that the prohibition against abortion counseling would be applied only to them and not physicians and therefore a new round of notice and comment would provide commenters "'their first occasion to offer new and different criticisms which the Agency might find convincing.'" *United Steelworkers of America v. Marshall,* 647 F.2d 1189, 1225 (D.C.Cir.1980) (quoting *BASF Wyandotte Corp. v. Castle,* 598 F.2d 637, 642 (1st Cir.1979), *cert. denied,* 444 U.S. 1096, 100 S.Ct. 1063, 62 L.Ed.2d 784 (1980)), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3148, 3149, 69 L.Ed.2d 997 (1981). In addition, a rulemaking would "force important issues into full public display and in that sense make for more responsible administrative action." *NLRB v. Wyman-Gordon Co.,* 394 U.S. 759, 779, 89 S.Ct. 1426, 1436, 22 L.Ed.2d 709 (1969) (Douglas, J., dissenting).

As an alternative ground for enjoining implementation of the Directives, the district court found that the rule was arbitrary and capricious because it lacked any reasoned basis in the record and therefore violated the principle identified in *Motor Vehicle Manufacturers Association* that "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made,'" 463 U.S. at 43, 103 S.Ct. at 2866 (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962)). Because we conclude that the rule should have been adopted pursuant to notice and comment, we need not decide whether it was arbitrary and capricious as well.[10]

**10.** *But cf. Fertilizer Inst.,* 935 F.2d at 1309 (interpretative rule that "runs contrary to the plain

### III. CONCLUSION

■ In 1988, HHS promulgated a regulation barring all abortion counseling by Title X projects on the basis of what the agency believed to be a required reading of the statute, and subsequently, against statutory and constitutional challenge in the Supreme Court, HHS stood by that interpretation. The agency did not, and indeed could not given its understanding of the statute, permit abortion counseling by some, but not other health care professionals. Against that backdrop, we cannot now accept HHS' characterization of its current reversal as a mere "interpretation" of the 1988 regulation when it is so abundantly apparent that the old regulation could not have admitted of the agency's present interpretation. In sum, the law seems clear that when an agency adopts a new construction of an old rule that repudiates or substantially amends the effect of the previous rule on the public, after the old interpretation of that rule has been advanced as a necessary interpretation of the statute and has been argued to and validated by the Supreme Court, the agency must adhere to the notice and comment requirements of § 553 of the APA.

We emphasize that the resolution we reach today says nothing of the propriety of any modifications to the gag rule. Within the context of a notice and comment rulemaking, HHS is free to discard previous views for justified reasons. *See Homemakers North Shore,* 832 F.2d at 413 ("[O]nce a regulation is adopted by notice-and-comment rulemaking ... its text may be changed only in that fashion."); *see also Chevron,* 467 U.S. at 840–41, 104 S.Ct. at 2780–81 (agency's change of interpretation was achieved through notice and comment rulemaking). In fact, in *Rust,* the Supreme Court found, with regard to the 1988 gag rule regulation, that "the Secretary amply justified his change of interpretation [from the prior rule] with a 'reasoned analysis,'" which included notice and comment rulemaking. —— U.S. at ——, 111 S.Ct. at 1769

meaning of the statute ... must be reversed").

(quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 42, 103 S.Ct. at 2866). We should expect as much of HHS' current change of interpretation. In situations such as this, public participation is likely to have its greatest benefit, and in turn, provide the agency with greater information from which it can make the most reasoned decision. In this litigation, the parties have disagreed strongly over the extent to which the Directives affect the rights, duties and obligations of doctors and nurses and one benefit of a notice and comment period is that presumably the agency can address more precisely the scope of any future alterations it proposes.

Accordingly, we lift this court's stay and reinstate the district court's injunction to the extent that the new policies encompassed in the Directives may not be enforced until and unless they are adopted in a notice and comment rulemaking.

*Affirmed.*