FIRST NATIONAL BANK,
et al., Plaintiffs,

v.

NATIONAL CREDIT UNION
ADMINISTRATION et
al., Defendants.

Civ. A. No. 90–2948.

United States District Court,
District of Columbia.

Sept. 15, 1994.

**10**

A. Douglas Melamed, Wilmer, Cutler & Pickering, Washington, DC, for plaintiffs.

Paul J. Lambert, Bingham, Dana & Gould, Washington, DC, for defendants-intervenors.

Kenneth L. Doroshow, U.S. Dept. of Justice, Washington, DC, for defendants.

## MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

On September 9, 1994, this Court conducted a hearing to consider whether the National Credit Union Administration's ("NCUA") interpretation of the "common bond provision" in the Federal Credit Union Act ("FCUA")[1] conflicts with the clear intent of Congress or whether the Court must defer to the NCUA's interpretation. The issue has been well-briefed on both sides. Based on the arguments and authorities presented by the parties in their briefs and during the hearing, we defer to the NCUA's interpretation of the common bond provision. Plaintiffs' renewed motion for summary judgment is denied and defendants' summary judgment motions are granted.[2]

### I. *Background*

In 1991, the Court determined that plaintiffs did not have standing to challenge the agency decision because they were not the intended beneficiaries of the FCUA and because Congress did not intend to protect competitive interests. 772 F.Supp. 609 (D.D.C.1991) (Harris, J.). The Court of Appeals reversed, 988 F.2d 1272 (D.C.Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 288, 126 L.Ed.2d 238 (1993), and the matter now comes before the undersigned judge for consideration on the merits.

Plaintiffs, four North Carolina banks and the American Bankers Association, challenge the NCUA's approval of several applications by AT & T Family Federal Credit Union ("AT & T Family") to expand its membership to include the employees of unrelated employers in several areas of the United States.

Plaintiffs, which are conventional banks and their trade association, contend that they are suffering from the competition caused by the expansion of AT & T Family. At the September 9th hearing, the Court concluded that it was impossible to consider the validity of the application approvals by the NCUA without examining its interpretation of the common bond provision. The remainder of this opinion will focus on the common bond provision and whether the NCUA's interpretation conflicts with Congress' intent.

Congress first authorized federal credit unions during the Great Depression. It will be recalled that in March 1933, President Roosevelt found it necessary to close all banks and that the woeful state of the nation's banking system during the early 1930s left large segments of the population without access to necessary credit. Congress reviewed the then existing system of state licensed credit unions and determined that federal credit unions would improve access to credit for people of "small means." S.Rep. No. 55, 73d Cong., 2d Sess. 1 (1934). The basic statute was passed at that time.

By definition, a federal credit union is owned by its members and can issue loans only to its members or to other credit unions. 12 U.S.C. § 1757. To insure sound loan policies in an era before deposit insurance,[3] Congress restricted membership to "groups having a common bond of occupation or association." *Id.* § 1759. The original purpose behind the common bond provision was twofold: to insure the financial stability of credit unions by providing a sense of cohesiveness among members and by enabling the members to establish a borrower's credit worthiness at minimum cost; and to promote the growth of credit unions because it was faster and easier to form a credit union with members who already had a common bond.

Until 1982, the NCUA and its regulatory predecessors interpreted the common bond provision as requiring that the members of

---

1. 12 U.S.C. § 1751 *et seq.,* particularly § 1759.

2. Defendants filed two separate summary judgment motions. The first was filed by the NCUA and the second by AT & T Family Federal Credit Union and Credit Union National Association.

3. Federal credit unions have only been covered by deposit insurance (called "share insurance") since 1970.

each credit union have a single common bond with each other, although beginning in the 1960s, the NCUA began expanding the criteria for determining common bond in response to changing economic conditions. For example, in 1968, the NCUA permitted a "once a member always a member" inclusion under common bond. General Accounting Office, *Credit Unions: Reforms for Ensuring Future Soundness* 217 (1991) (hereafter "GAO Report"). The NCUA has followed a broader interpretation of "common bond" since 1982 which allows multiple unrelated groups to join the same credit union if each group has a common bond among its members.

The expansion of AT & T Family is premised on this interpretation which plaintiffs now challenge.[4] Plaintiffs seek injunctive and declaratory relief vacating all AT & T Family membership approvals since November 14, 1989.[5] Relief is sought on the theory that the NCUA's approval of the membership expansions violates the Administrative Procedure Act ("APA").[6] 5 U.S.C. § 706.

## II. *Analysis*

■ There are no material questions of fact precluding summary judgment in this case. The Court's review of an agency's interpretation of a statute must follow "the well-trodden path carved out in *Chevron U.S.A., Inc. v. National Resources Defense Council, Inc.,* 467 U.S. 837 [104 S.Ct. 2778, 81 L.Ed.2d 694] (1984)." *Northwest Airlines, Inc. v. U.S. Dept. of Transportation,* 15 F.3d 1112, 1118 (D.C.Cir.1994). The first prong of the *Chevron* formulation, often called "*Chevron I,*" asks whether the Court, armed with the traditional tools of statutory construction, ... can ascertain clear congressional intent on the *precise* issue before us.

*Id.* (emphasis added). If the statutory language is silent or ambiguous on this specific issue, the Court then proceeds to the second prong of the *Chevron* formulation, "*Chevron II.*" *Doe v. Sullivan,* 938 F.2d 1370, 1381 (D.C.Cir.1991). Under *Chevron II,* the Court must determine whether the agency's interpretation of the statute is a reasonable one. We are required to defer to the agency's construction of the statute as long as it is reasonable or permissible. *Id.*

### A. *Chevron I: Congressional Intent*

#### 1. *The Language of the Statute*

■ The Court looks first to the language of the statute itself in establishing whether Congress intended to limit credit union membership to individuals having a single common bond.[7] *Nichols v. Asbestos Workers Local 24 Pension Plan,* 835 F.2d 881, 892 n. 86 (D.C.Cir.1987) ("the best guide to what a statute *means* is what it *says*") (emphasis in original). Plaintiffs argue that the common bond provision should be read in the singular, i.e., that each credit union shall have a single common bond. Defendants counter that the reference to "groups" proves that Congress contemplated multiple groups within a single credit union.

The Court concludes that either interpretation is plausible. The first portion of the statute appears to use "federal credit union membership" in the singular as it requires each member to "subscribe to at least one share of its [the credit union's] stock." It is plausible that the second reference to "Federal credit union membership", in the com-

---

4. AT & T Family serves the employees of 150 unrelated employers, and has assets of more than $267,800,000.

5. The relevance of this date has not been made known to the Court.

6. The APA allows the reviewing court to set aside agency action found to be "arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with the law." § 706(2)(A).

7. The relevant portion of the statute at issue reads as follows:

Federal credit union membership shall consist of the incorporators and such other persons and incorporated and unincorporated organizations, to the extent permitted by rules and regulations prescribed by [the NCUA], as may be elected to membership and as such shall each, subscribe to at least one share of *its* stock and pay the initial installment thereon and a uniform entrance fee if required by the board of directors; except that Federal credit union membership shall be limited to *groups* having a common bond of occupation or association....

§ 1759 (emphasis added).

mon bond phrase, is also meant in the singular, but then contemplates several "groups" within that one credit union. A "court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *McCarthy v. Bronson,* 500 U.S. 136, 139, 111 S.Ct. 1737, 1740, 114 L.Ed.2d 194 (1991). Therefore, a reasonable reading of the common bond provision is that a credit union may have several groups, each with its own common bond.[8]

Plaintiffs counter that such a reading of the statute would permit limitless growth by federal credit unions and frustrate the limitations evident in the statutory language. We disagree. "Whereas almost all private business will serve any customer, the 'customers' of each federal credit union ... are expressly 'limited to groups having a common bond.'" *United States v. Michigan,* 851 F.2d 803, 807 (6th Cir.1988). Each group must "be employed by the same enterprise" or belong to the same association that has "common loyalties" and holds yearly meetings.[9] 54 Fed. Reg. 31169.

■ When an agency's interpretation is one of two plausible alternatives, the statute is ambiguous. *International Union, UMW v. Federal Mine Safety and Health Admin.,* 920 F.2d 960, 963 (D.C.Cir.1990) (statute is ambiguous if it does "not clearly preclud[e]" the agency's approach). Next we look to the legislative history for a possible resolution of this ambiguity.

### 2. Legislative History of the Common Bond Provision

The legislative history concerning the common bond provision is predictably murky and is a slender reed upon which to place reliance. "Congress did not ... elaborate on th[e] definition [of the common-bond provision] at the time [the FCUA was debated] or express the reason for the requirement." GAO Report at 217.[10] Both sides point to isolated portions of the record; particularly to the differing language in the Senate and House of Representatives committee reports of 60 years ago.

Plaintiffs rely on a statement from a 1934 Senate Report in which the Committee describes credit unions as, *inter alia,* "limited in each case to the members of a specific group with a common bond of occupation or association." S.Rep. No. 555, 73d Cong., 2d Sess. (1934). In context, however, this statement may well be little more than a description of the field of state credit unions as they existed in 1934. It appears to be a descriptive rather than exhaustive statement and not meant to define the limits of credit union organization. NCUA Report at 14.[11]

■ Defendants seize upon the House Report which indicates that "[m]embership in Federal credit unions is limited to groups having common bonds of occupation or association or to groups within well-defined communities." H.R.Rep. No. 2021, 73d Cong., 2d Sess. 3 (1934). We are equally unwilling to overemphasize the importance of this statement. The legislative record, taken as a

**8.** The Court disagrees that other federal courts have held to the contrary. In all but one of the cases cited by plaintiffs, the common bond provision was not at issue in the case. *See e.g. Sister of the Presentation of the Blessed Virgin Mary v. NCUA,* 961 F.2d 733 (8th Cir.1992) (determining whether credit union member was an "equity holder" or a "creditor"). The one case that discussed the common bond provision in any detail, *Bd. of Dir. Forbes Federal Credit Union v. NCUA,* 477 F.2d 777 (10th Cir.), *cert. denied,* 414 U.S. 924, 94 S.Ct. 233, 38 L.Ed.2d 158 (1973), was issued prior to the NCUA's 1982 interpretation. In addition, the case concerned an attempt by a credit union to reinterpret its single common bond, not an attempt to reinterpret the concept of a "common bond" by adding unrelated groups.

**9.** There are other limits on the expansion of credit unions. *See e.g.* 54 Fed.Reg. 31176 (enumerating various limitations); GAO Report at 219–20.

**10.** *See also* NCUA, *Studies in Federal Credit Union Chartering Policy* 12 (1979) (hereafter "NCUA Report") ("There is very little in the legislative history that can be characterized as a[n] insightful, analytic discussion of the essence of the [common-bond] phrase, and of its intended scope and application"); A. Burger & T. Dacin, *Field of Membership: An Evolving Concept* (2d ed. 1992).

**11.** It should be noted that although this report was prepared by defendant NCUA, it predates by three years the interpretive change at issue in this case.

whole, does not provide the clear and certain indication that Congress intended to preclude the NCUA's current interpretation of the common bond provision. *Rust v. Sullivan,* 500 U.S. 173, 184, 111 S.Ct. 1759, 1768, 114 L.Ed.2d 233 (1991); *Crooker v. Bureau of Alcohol, Tobacco & Firearms,* 670 F.2d 1051, 1057 (D.C.Cir.1981).

■ What remains evident is the overall congressional intent to promote the creation and growth of credit unions. *First Nat'l Bank & Trust,* 988 F.2d at 1275 ("Congress' general purpose was to encourage the proliferation of credit unions"). It is readily apparent that the common bond provision was not the defining characteristic of a credit union.[12] *Barany v. Buller,* 670 F.2d 726, 734 (7th Cir.1982) ("[t]he salient feature of credit unions is their democratic control and management"); S.Rep. No. 555, 73d Cong., 2d Sess. 8 (1934) ("the sole purpose in the bill is to protect credit unions from further losses from the failure of banks which constituted the greatest source of loss to credit unions during the depression"). In determining the meaning of a specific provision, the Court must look to the provisions of the entire law, and to its object and policy. *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 51, 107 S.Ct. 1549, 1555, 95 L.Ed.2d 39 (1987).

■ The common bond provision was not an end in itself, but its purpose was to support the underlying policy of promoting stable credit unions. It also suggests that Congress intended a flexible interpretation of the provision.[13] This assumption is supported by the fact that Congress has not objected to either the original agency interpretation or the 1982 expansion.[14] "[A] refusal by Congress to overrule an agency's construction of legislation is at least some evidence of the reasonableness of that construction." *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 137, 106 S.Ct. 455, 464, 88 L.Ed.2d 419 (1985).

The NCUA was given a mandate to "provide more flexible and innovative regulation" in the face of changing economic conditions. S.Rep. No. 91–518, 91st Cong., 2d Sess. (1970), U.S.Code Cong. & Admin.News 1970, p. 2479, 2481. Such economic changes require only brief discussion. For example, until 1970, share accounts in federal credit unions were not insured. Until that time, a restrictive definition of "common bond" served the goal of individualized loan decisions by members who knew one another. *See* GAO Report at 231. Now that share accounts are insured, the NCUA, and it appears Congress as well, has determined that larger credit unions can better spread the risk of loan defaults. *See e.g. id.* at 219 (FCUA amended in October 1992 to allow the NCUA to merge or transfer assets of credit unions in danger of insolvency).

In sum, the congressional record does not provide a clear indication that Congress intended to limit each credit union to a single group sharing a common bond. In the face of such ambiguity we cannot conclude that Congress precluded the NCUA's interpretation of the common bond provision. Therefore, it is necessary to determine whether this interpretation is reasonable.

### B. *Chevron II: Reasonableness of the NCUA's Interpretation*

■ It is well established that, in case of ambiguity, we must defer to the agency's

---

12. The common-bond concept does not appear anywhere in the statutory definition of a credit union. *See* 12 U.S.C. § 1752(1).

13. The Court rejects plaintiffs' contention that the NCUA policy is contrary to Congress' intent simply because the policy may represent a change from nearly 50 years of prior interpretation. *Rust,* 500 U.S. at 186, 111 S.Ct. at 1769 ("[t]his Court has rejected the argument that an agency's interpretation 'is not entitled to deference because it represents a sharp break with prior interpretations' of the statute in question") (*citing Chevron,* 467 U.S. at 862, 104 S.Ct. at 2791); *see also Nat'l Family Planning and Repro-*

*ductive Health Ass'n v. Sullivan,* 979 F.2d 227, 230–31 (D.C.Cir.1992) ("[a]n agency, in light of changed circumstances, is free to alter the interpretive and policy views reflected in regulations construing an underlying statute, so long as any changed construction ... is consistent with express congressional intent or embodies a 'permissible' reading of the statute").

14. Congress was repeatedly made aware of the revised common bond interpretation by the NCUA, by lobbyists from the banking industry, and by the GAO. *See e.g.* NCUA 1982 Annual Report to Congress, 1; GAO Report at 218–19.

interpretation if it is a reasonable one. Plaintiffs have not seriously argued that the interpretation under challenge is unreasonable. Indeed, it would be a daunting task for them to do so. The NCUA's interpretation in fact advances Congress' goal of promoting the creation and growth of credit unions. For example, NCUA policy requires that groups seeking to form credit unions have at least 500 members. Many of the recent additions to AT & T Family are companies employing far fewer than 500 people. Employees in small companies have gained the access to credit unions that they would be denied under plaintiffs' interpretation.

### III. *Conclusion*

The Court concludes that the NCUA's interpretation of the common-bond provision is a reasonable construction of an ambiguous statute. We acknowledge that it is debatable whether credit unions the size of AT & T Family continue to need the special protection afforded by the FCUA. However, this is a policy matter best left to Congress. Until Congress addresses this matter, the Court will defer to the agency's interpretation of the statute at issue. Plaintiffs' renewed motion for summary judgment is denied and defendants' motions for summary judgment are granted.